Opinion delivered November 13, 1939.

*J. W. Jamison* and *Warner & Warner,* for appellant.
*Partain & Agee,* for appellee.

Griffin Smith, C. J.    Appellee had, for five years, occupied a building in the city of Van Buren, dimensions of which were 26 by 70 feet.  There were two partitions. In October, 1937, appellee purchased the property.  He operated a liquor store, beauty shop, and barber shop. Complaint was filed June 15, 1938, with trial December 6 of the same year.

Appellant's railway was constructed in 1882.  Between the railway and a street crossing there are buildings other than appellee's.

Averment of the complaint is that appellee's premises were overflowed because of the negligence of appellants; that at such flood times appellee's stock of whisky was worth $4,000; that water came into the building to a depth of three or four inches, and that on two occasions 150 cases of whisky were stored on the floor, with resulting water damage. The first overflow affecting the whisky occcurred in 1936. Later, similar losses were occasioned, the contention being that in each instance 100 cases were damaged, and that in addition, repairs to the building were necessitated. Appellee's testimony was that $60 was spent repairing the walls, and that it cost $300 to repaper. New linoleum was put down, but another flood washed cinders under it.

Appellee insists he had a loss of $5 the case on the damaged whisky; that the market price before flooding occurred was $24, and that it was $19 thereafter.

Specifically, damages to the building were: Plaster came off the walls from a point touching the floor and extending up three or four feet. Before inundation the building was worth $1,500; thereafter (and presumably prior to the time repairs were made), its market value was $1,000.

On the question of damages to the whisky, appellee testified: "I carry different kinds of whisky that cost me from $15 to $18, and I get $24 a case for it." He admitted the revenue stamps were not destroyed; that damage was to the containers and labels, and that the whisky was sold to people who, in respect of the labels and cartons, "didn't care."

A contractor of Van Buren, who examined the Spradley building in June (1938), testified as to cost of entirely replacing the floor. He said: "The entire damaged portion pointed out to me would cost $380." Depreciation was 70 per cent., leaving the net damage $117. Papering, plastering, etc., when added to the flooring costs, would bring the total to $528. If depreciation of 70 per cent. were allowed, the actual damage was $256.

Appellee contends flooding was caused by the railroad company's act in constructing a "stringer" about eight inches thick and four inches wide. There were two of these timbers ". . . and that wall is about 60 or 70 feet long." This structure, he said, was "right on the railroad track—as near the track as it can be and still be in the clear. It looks like a sill from a box car. It is within three or four feet of the end of the ties, between my building and the track, and the top is level with the base of the track. Some addition was made to the wall in June of this year—an addition to what you call the south end of the wall. There was a little culvert built under the track, about three inches deep. They had to build that to carry the water under the track. It is just level with the ties. That little culvert forces the water in under there, but that wouldn't take care of the water. You can see the high water mark on the wall and it is four inches higher than that."

In the language of the complaint, the act of negligence alleged is that appellants ". . . erected and maintained a certain wall and abutment immediately north of and adjacent to plaintiff's said property . . ."

Appellants have pleaded the three-year statute of limitation. It is shown that the structure of which complaint is made was built March 18 or 19, 1935; and, the complaint not having been filed until June 15, 1938, approximately three years and three months intervened.

It is uncontradicted that the track and embankment upon which it rests have not been changed materially since 1882, except in the matter of laying the stringer. Immediately north is Log Town Hill. Appellee's building is on the right-of-way line—according to the testimony of appellants' engineer Collett, 25 feet from the track, one corner being slightly nearer the track than is the other. The right-of-way touches Spradley's property at the northeast corner. General slope of the ground is to the south and west. Fayetteville street slopes south, with a six per cent. grade. It is paved with concrete and has concrete curbs. During rainy periods water comes down the gutter in Fayetteville street and at times col-

lects at a catch basin on the north side of Spencer track. Elevation of the land north of Fayetteville street is greater than that of the railway. Natural drainage from that area is to the south. The amount of water collected is occasionally too great for the catch basin's capacity. During unusual rains water comes down Fayetteville street very rapidly, overflows at the catch basin, then goes over the tracks on to Main street. The rail flanges hold about three inches of the flood. There is a slope toward Spradley's building. The buildings between Spradley's property and Fayetteville street are higher, and drainage is gradually in appellee's direction.

After describing construction of the stringer, the witness Collett said: "At the west end a drain is under the ties to take care of water collected on the north side of the main track, and it empties into Knox street on the north side. The timber (stringer) is about even with the northeast corner of Spradley's building . . . Spradley has a down spout on his building and retaining wall paved with brick 14 inches from the back end of his building. . . . Spradley's drain is a 15-inch gutter, 14 inches wide and 18 inches deep, with 5-inch drain from it. Water from down spout of his building flows in the gutter, which is 14 x 18, supposed to be connected with the sewer, but the spout is broken in two. The pipe starts down, then there is a space where there is no pipe, then it starts again. Water flows down in this 14-inch gutter . . . the gutter at the back of his building was filled with debris. The drain at the bottom of the gutter had been stopped up.

"The drain under the track could not be higher than the ties, and a board was put there while water was running to force the water through the tracks over on the other side. . . . The steep grade extends back 2,500 feet from the track. The area of ground drained naturally to this stringer back of the building is 3,406 square feet. The opening through the drain at the west end of the stringer under the track is 9 x 10 inches. . . . It carries 90 square inches, and will take care of an area

of two times the [amount of water discharged against the stringer]."

From this testimony it will be seen that appellee's contention is that construction of the stringer system in 1935 had the effect of interrupting normal flow of the water, with the result that a part of the impounded flowage was liberated in an unnatural manner, accelerating the normal escapement, with consequent damages.

The law in respect of the statute of limitations is stated in *Chicago, Rock Island & Pacific Railway Co.* v. *Humphreys,* 107 Ark. 330, 155 S. W. 127, L. R. A. 1916E, 962, as follows:

"Permanency of the structure or obstruction impeding the flow of water is not the controlling question. Indeed, the question cannot arise unless the obstruction is of a permanent nature, but its permanency does not of itself determine whether the damages, which result from its erection, are original or recuring. If it is of such a construction as that damage must necessarily result, and the certainty, nature and extent of this damage may be reasonably ascertained and estimated at the time of its construction, then the damage is original and there can be but a single recovery and the statute of limitation against such cause of action is set in motion on the completion of the obstruction. If it is known merely that damage is probable, or, that even though some damage is certain, the nature and the extent of that damage cannot be reasonably known and fairly estimated, but would be only speculative and conjectural, then the statute of limitation is not set in motion until the injury occurs, and there may be as many successive recoveries as there are injuries."

Tested by this rule, can we say that appellee, when the stringer was erected, was charged with knowledge of its permanent nature and with notice of the extent to which injuries would ensue? Could he reasonably prejudge the injury which would result as a natural consequence? We think there must be a negative answer to the question.

Appellee, of course, knew the property was subject to overflow, for he testified: ''[Flooding] has been going on ever since I have had a liquor store—as far as that is concerned, ever since I went in there.'' He had already testified to having been there five years, or since December, 1933. The testimony of Eugene Leigh that the floor was fifteen years old, that it had settled and was ''sagging,'' indicating that the joists were rotting, is undisputed.

The cross-examination of appellants' engineer is sufficient to show that the damage incident to construction of the stringer was not original; that consequences were not predictable in March, 1935, and that overflows have been recurring. The engineer testified it could not be told [at the time the structure was placed] that its erection would damage Spradley's property ''any more than it might have been [damaged] in the past.'' There is this statement: ''I would not think, as an engineer familiar with conditions and rainfall and construction of this wall, that it might cause damage to the property.''

If the engineer could not predict consequences, appellee will not be held to a higher degree of perspective.

The matter of greatest difficulty is determination of the amount of damages. The whisky, appellee testified, was sold to out-of-state people. The following statements appear in the examination of appellee:

''Q. What kind of liquor do you carry—this $24 whisky? A. I carry different kinds of whisky that cost me from $15 to $18 and I get $24 a case for it.

''Q. You sold this liquor for $19 a case? A. Yes, sir.''

Considering only the cost price, and the price realized for the so-called ''damaged'' whisky, there was in reality a profit rather than a loss. All of it was sold for $19 a case. Some cost $15, on which there was a profit of $4. Other brands cost $18, on which the profit was $1. Literally construed, appellee's testimony is to the effect that he sold for $24 whisky that cost $15. His

recovery of $1,000 on the flooded cases was predicated upon anticipated or expectant profits.

The authorities generally recognize that a recovery will lie for profits prevented through breach of contract, or by reason of a defendant's tortious acts. There is the condition, however, that the profits claimed to have been lost would reasonably have been realized except for the defendant's wrongful conduct. The views expressed in earlier American and English decisions, excluding profits altogether as an element of recoverable damages in such actions, are no longer followed. 15 American Jurisprudence, § 149. The same authority (§ 150) says that to warrant a recovery in such circumstances, profits must be capable of proof with reasonable certainty, and no recovery can be had for loss of profits which are uncertain, contingent, conjectural, or speculative. In *Pollock* v. *Gantt,* 69 Ala. 373, 44 Am. Rep. 519; *Jones* v. *Call,* 96 N. C. 337, 2 S. E. 647, 60 Am. Rep. 416; *Houston & T. C. R. Co.* v. *Hill,* 63 Tex. 381, 51 Am. Rep. 642, it was held that estimated profits of [the businesses in question] were too speculative and remote.

In the American Law institute's Restatement of the Law of Contracts (§ 331) it is said that damages are recoverable for profits prevented by the breach of a contract only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.''

In an opinion of this court—*Western Union Telegraph Co.* v. *Caldwell,* 133 Ark. 184, 202 S. W. 232, L. R. A. 1918D, 121—it was said: ''Profits to be recovered must be such as would have accrued and grown out of the contract itself as the direct and immediate result of its fulfillment. Profits cannot be recovered as damages if they result from an independent and collateral undertaking, although entered into on the faith of the principal contract.'' The controversy in the Caldwell Case arose through failure to deliver a telegram.

In the case at bar we have the naked assertion of appellee that the whisky was worth $24 before damage

occurred, and that he sold it for $19. His unsupported opinion that it was "worth" $24 falls short of being substantial proof that if the particular whisky had not been damaged he could have sold it for the larger price. True, an inference arises from the testimony, but in computing prospective profits, something more than an inference is necessary. Appellee treats as one and the same commodity liquor costing $15 and that which cost $18.

We think the proof is insufficient on this allegation, and hold that appellee has failed to establish the alleged loss of profit, or any part of it.

*As to damages to appellee's building*: There is sufficient evidence to warrant some recovery. Here, again, we have the unsupported declaration of appellee that damages were $500 because the building was worth $1,500 before being flooded, and $1,000 thereafter. It must be remembered, however, that it was flooded many times, and appellee is significantly silent as to when the damages occurred for which compensation is asked. There is an assertion he spent $60 repairing the walls, and $300 repapering, but nothing from this witness as to depreciation.

Appellee says the witness for appellants, after allowing for depreciation, placed the damage at $256 ". . . for necessary repairs caused by the water." We do not understand this to be the effect of the testimony referred to. The statement was that the floor had been in place 15 years, and that it was sunk, with rotting sills, etc. In view of appellee's admissions that water had been causing trouble for five years, it is necessary to attribute a part of the damage to overflows which occurred prior to March, 1935.

The jury speculated in arriving at its verdict, and the result cannot be fully justified upon any evidence introduced. The nearest approach to reasonable accuracy appears in the testimony of the contractor. He gave detailed estimates on replacements, then estimated depreciation. We are not sure his conclusions in respect of

depreciation are correct, and will not bind appellee thereby.

Judgment for loss of prospective profits on the whisky is reversed. The cause is dismissed.

If, within 15 days, appellee shall enter a *remittitur* whereby judgment to compensate damages to the building is reduced to $256, it will be affirmed for such sum. Otherwise, the judgment will be reversed and the cause remanded with directions to retry as to the issue of real property damages.