**ARCHER–DANIELS–MIDLAND COM-
PANY, Plaintiff,**

v.

**R. C. PAULL, Virginia Paull, and Paull's
Hatchery, Inc., Defendants.**

Civ. A. No. 473.

United States District Court
W. D. Arkansas,
Harrison Division.

Oct. 26, 1960.

Fitton & Adams, Harrison, Ark., for plaintiff.

Crouch, Jones, Blair & Cypert, Springdale, Ark., J. E. Simpson, Berryville, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

### Statement

This is an action by the plaintiff, Archer-Daniels-Midland Company, arising out of its turkey financing program in northwest Arkansas for the years 1958 and 1959. The plaintiff seeks to recover on two notes executed by the defendant, R. C. Paull, and representing the loss incurred in 1958 by Paull individually and by the Poor Boy Feed Company, a joint venture, composed of Paull and Louis Flentge, in the turkey operations for 1958. In addition, plaintiff seeks to recover for financing advanced to Paull's Hatchery, Inc., for its 1959 turkey breeder flocks. The corporation's indebtedness is allegedly evidenced by certain delivery receipts signed by R. C. Paull. Mrs. Paull is alleged to be a guarantor to the plaintiff of the obligations of Paull's Hatchery, Inc.

Each of the defendants denies the material allegations of the complaint, and R. C. Paull and Paull's Hatchery, Inc., each filed counterclaims against the plaintiff. R. C. Paull contends that the plaintiff contracted to finance him individually for the growing of 20,000 range turkeys during 1959, and that it contracted to finance 40,000 additional range turkeys for the Poor Boy Feed Company. Paull further contends that the plaintiff breached each of these contracts.

Paull's Hatchery, Inc., alleges in its counterclaim that the plaintiff contracted to provide financing for growers to purchase 90,000 turkey poults (baby turkeys) to be hatched by the corporation and that it breached this contract.

The case was tried to the court on September 14 and 15, 1960, and at the conclusion of the testimony, the court directed the attorneys for the respective parties to file memorandum briefs in support of their contentions. The briefs have been received and considered, along with all the testimony and the evidence, and the court now files its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

The plaintiff, Archer-Daniels-Midland Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in Minneapolis, Minnesota.

The defendants, R. C. Paull and Virginia Paull, are citizens of the Western District of Arkansas and reside at Berryville. The defendant, Paull's Hatchery, Inc., is an Arkansas corporation with its principal place of business at Berryville, Arkansas.

The amount in controversy is in excess of $10,000, exclusive of interest and costs.

### 2.

The plaintiff corporation engages in diversified lines of business. For several years prior to August 1960 it was engaged in the poultry feed business as one of its endeavors. This particular business was operated by the Feed Division of the plaintiff corporation. Ferris H. Nichols was the Credit Manager for the Feed Division during its operation in Arkansas. Mr. Nichols worked under the supervision of Wilbur F. Anderson, General Credit Manager of Archer-Daniels-Midland Company. From November 1958 until the time of its withdrawal from the poultry feed business in northern Arkansas, Clyde C. Meinhoefer was General Manager of the Feed Division. As General Manager, Meinhoefer directed the production, sales and financing activities of the plaintiff in its feed operations. Meinhoefer, Anderson, and Nichols all worked out of the home office of the plaintiff in Minneapolis, Minnesota.

The sales force of plaintiff's Feed Division for the southwestern region, of which Arkansas is a part, was headed by Frank Burson, who resided in Kansas City, Missouri, Leroy Dameron was the plaintiff's salesman for the northwest Arkansas district, and Billy Eldridge was the plaintiff's service man for that area. In this capacity, Eldridge inspected the flocks of turkeys financed by the plaintiff, and made recommendations to the growers for improvements, better sanitation, and marketing. The plaintiff operated a feed mill at Hollister, Missouri, where it manufactured most of the feed sold in the northwest Arkansas area.

The plaintiff conducted its turkey financing program in the customary fashion. It would receive a comprehensive financial statement from a grower upon commencing to do business with him. After the grower was once approved, the plaintiff would agree each year to finance up to a specified number of turkeys for the grower at a specified dollar amount per bird. As an example, the plaintiff might agree to finance for Farmer Jones 10,000 turkeys at up to $3 per turkey. The grower in turn agreed to use plaintiff's products exclusively in the growing of the flocks so financed. Upon receipt of the poults (baby turkeys) from the hatchery, the grower would execute a separate application on each flock indicating the number and type of turkeys in the flock and the location where they were to be raised. This enabled the plaintiff to keep track of the location of turkeys financed by it, and to determine production requirements of its mill. As each new flock was placed, the plaintiff would deduct the number of turkeys in the flock from its general commitment for the year. The grower would also execute a chattel mortgage covering the flock at this time. The plaintiff would pay the hatchery for the poults on behalf of the grower, and would also provide feed and medication up to the dollar limit for each turkey. When the turkeys were marketed, the processor would issue a check to the grower and the plaintiff jointly. The grower would endorse the check and forward it to the plaintiff who would deposit it. The plaintiff would then deduct the cost of the financing advanced on that particular flock, and would send the grower a check for the balance, if any.

### 3.

The defendant, R. C. Paull, started in the turkey business in 1945 as a hatchery employee at Springfield, Missouri. Since 1951 Paull has operated his own turkey business in Berryville, Arkansas. As an individual, defendant Paull has been engaged as a turkey grower, that is, he would secure poults from a hatchery and raise them under a financing plan such

as heretofore outlined. He did business with various other feed companies under this type of financing arrangement prior to 1956, when he began raising flocks of turkeys under financing agreements with the plaintiff. At no time, however, did he deal exclusively with the plaintiff on all of his flocks. He and the plaintiff enjoyed a satisfactory relationship prior to the 1959 turkey season, although during the 1958 turkey season he sustained a loss on the flocks raised by him as an individual under the plaintiff's financing plan. At the conclusion of the 1958 turkey season, Paull individually owed the plaintiff a balance of $8,156.50.

### 4.

Paull's Hatchery, Inc., is an Arkansas corporation which owns and operates a turkey hatchery at Berryville, Arkansas. All of the stock of the corporation is owned by R. C. Paull and his wife, Virginia Paull. He is President and General Manager of the corporation.

The hatchery generally operates by purchasing breeder flocks of turkeys each year, which would produce eggs to be placed in the hatchery. A period of four weeks is required to hatch a turkey egg for a range-type turkey. A range turkey is the large broad-breasted type commonly consumed at Thanksgiving and Christmas. When the eggs are hatched, the hatchery sells the poults to various growers and the hatchery is usually paid by a feed company for the account of the grower. The hatchery owned by the defendant corporation can accommodate 133,000 eggs at one time. The eggs are placed in the hatchery at intervals so as to provide a staggered production of poults, which results in finished turkeys being marketed at intervals during October, November, and December of each year.

### 5.

In January 1958, R. C. Paull was contacted by a representative of Archer-Daniels-Midland Company, and a conference resulted between Paull, Louis Flentge, a local Berryville feed dealer and turkey grower, and the plaintiff corporation represented by F. H. Nichols and Frank Burson. The plaintiff's representatives expressed an interest in undertaking a complete turkey feeding program. Under such a program, turkeys would be fed Archer-Daniels-Midland feed exclusively with no locally procured grain supplements as are customarily used. Nichols expressed an interest in R. C. Paull and Louis Flentge forming a partnership to act as growers, financed by plaintiff, for this "pilot" type operation. It was further agreed that Paull and Flentge would receive special consideration on the price of the feed for the purpose of this pilot operation.

Flentge and Paull then formed a joint venture and conducted its business as the Poor Boy Feed Company. Flentge and Paull were jointly and severally liable for the losses of the joint venture. The plaintiff agreed to finance up to 60,000 range turkeys during the 1958 season for the Poor Boy Company. This figure was subsequently raised by mutual consent to 80,000 turkeys. Paull and Flentge were to share the costs and the profits or losses of the Poor Boy operation on an equal basis.

The Poor Boy Feed Company would place the poults owned by it on various farms in the Berryville area and would pay the farmer a set price per head for each finished turkey. All feed and medication were provided by the Poor Boy Company and were financed by the plaintiff. Plaintiff also provided the services of its field service representative to inspect the flocks for health and sanitation conditions.

The 1958 turkey operations of the Poor Boy Feed Company resulted in a net loss. At the completion of the 1958 turkey season, the Poor Boy Feed Company owed the plaintiff $11,154.64 for financing the poults, feed and medication, and also owed its growers $16,518.16 for raising the turkeys. The loss sustained by the Poor Boy Feed Company in its 1958 turkey operations was attributed in part to poor quality breeder hens which produced the eggs for the 1958 flocks.

**6.**

In late November 1958, sometime after Thanksgiving, a meeting was held in Berryville, Arkansas, to discuss plans for the 1959 turkey growing season to be financed by the plaintiff. At that time not all of the 1958 turkeys had been marketed, but it was apparent that the growers would sustain a net loss for that year. Present at this late November meeting were R. C. Paull, Louis Flentge, and Rex Villines, a local turkey grower and feed dealer. The plaintiff was represented by F. H. Nichols, Frank Burson and Leroy Dameron.

Two weeks prior to this meeting, R. C. Paull had received approval of Nutrina Mills, a competitive poultry feed producer, to finance the growing of 40,000 range turkeys by him individually. Paull's financing arrangements with Nutrina were basically the same as plaintiff's plan outlined above.

It was agreed between the parties at the meeting in late November 1958 that the plaintiff would finance the growing of 40,000 range turkeys at up to $3.75 per bird for the Poor Boy Feed Company during the 1959 season. The plaintiff's products were to be used exclusively in the growing of these flocks. Paull's Hatchery, Inc., was to furnish the turkey poults at 50 cents per poult, and was to be paid by the plaintiff on behalf of Poor Boy Company for the poults. The 50-cent poult cost was included in the $3.75 total financing made available per turkey by the plaintiff. Other details were to be on the same basis as in the 1958 program.

The plaintiff also agreed to finance the growing of 20,000 range turkeys for R. C. Paull individually during the 1959 season on the same basis as for the Poor Boy Feed Company except that Paull individually was to secure his own poults, and they were not to come from the breeder flock financed by the plaintiff.

It was further agreed that Paull's Hatchery, Inc., would secure the flock of breeder turkeys required to produce the eggs, which would then be hatched, thereby producing the turkey poults required for certain range flocks to be financed by the plaintiff, including the Poor Boy flocks. The plaintiff agreed to finance the breeder flock for Paull's Hatchery, Inc., and to assist in selecting the hens for the flocks so as to attempt to circumvent the losses incurred during the 1958 season resulting from poor quality breeder hens. The plaintiff agreed to advance up to $6 per breeder turkey, with a total of 3,000 turkeys in the flocks.

F. H. Nichols acted on behalf of the plaintiff in making the above agreements, with the consent and approval of the superior officials of plaintiff.

**7.**

Immediately after the late November 1958 meeting, R. C. Paull, acting on behalf of Paull's Hatchery, Inc., began selecting a breeder flock for the 1959 program. He was assisted in this task by Billy Eldridge, field service representative for the plaintiff corporation. Approximately 3,000 turkeys were selected for the breeder flock. Paull's Hatchery, Inc., made arrangements with three local farmers for each to field one-third of the breeder flock, and agreed to pay the farmers 5 cents for each egg gathered by the farmers.

**8.**

During November 1958, R. C. Paull and Louis Flentge realized that their 1958 turkey program would result in a severe loss. Paull and Flentge attempted to contact F. H. Nichols but were not able to arrange a meeting with him. In early January 1959, Paull and Flentge attended the National Turkey Growers Convention in Des Moines, Iowa. While there they met with Clyde C. Meinhoefer, newly appointed General Manager of the Feed Division of plaintiff corporation, and Elmer Ziegenhagen, Sales Manager of the Feed Division. Paull and Flentge attempted to borrow $16,000 from the plaintiff to cover debts owed by the Poor Boy Feed Company to various growers. Meinhoefer stated that he would attempt to get the officials of the corporation to agree to such a loan

upon his return to Minneapolis. Meinhoefer also suggested that the Poor Boy Feed Company consider growing some broiler-type turkeys to be financed by the plaintiff. This is a small-type turkey which requires only 16 weeks feeding after hatching. It was Meinhoefer's idea that by raising some broiler-type turkeys, the Poor Boy Company would be able to make a relatively fast profit, which would be applied to the balance owed the plaintiff for the 1958 operations.

No changes were made at this meeting in the 1959 range turkey program agreed upon in November 1958.

### 9.

In late January 1959, F. H. Nichols called upon R. C. Paull at Berryville, Arkansas. At that time Paull gave Nichols a check for $8,156.50, covering the amount owed by Paull individually on the 1958 program. Paull also inquired concerning the status of his requested $16,000 loan, and was informed that no action had been taken on it.

Nichols returned to Paull's office the following day and gave back to Paull the check for $8,156.50, suggesting that Paull use that money to help pay the growers the $16,000 owed them by the Poor Boy Company. This suggestion was made with the approval of plaintiff's home office. Nichols then took a promissory note from Paull individually in the amount of $8,156.50. He also had Paull sign a note for $11,154.64, representing the balance due plaintiff from the Poor Boy Feed Company for the 1958 feed program. Louis Flentge also signed the Poor Boy note. Paull then proceeded to pay off the $16,000 owed the growers by the Poor Boy Company and took an unsecured note from Louis Flentge for his share of the $16,000.

### 10.

On February 4, 1959, F. H. Nichols, representing the plaintiff, wrote the Poor Boy Feed Company a letter summarizing plaintiff's 1959 feed financing program as it pertained to the Poor Boy

Company. Included in the letter was a statement of plaintiff's agreement to furnish financing for 40,000 broiler turkeys and 40,000 range turkeys for the Poor Boy Company.

By the middle of February 1959 the Paull's Hatchery breeder flock, financed by the plaintiff, had already started producing eggs which were being delivered to the hatchery. Eggs were placed in the hatchery twice each week, and four weeks are required for the hatching of the eggs. The first hatch was to be completed on March 17, 1960. The cost of producing a range turkey poult is 47 cents. This includes the cost of the egg and the hatchery expense. By March 13, 1959, 80,000 eggs were on hatch at the defendant hatchery. Two-thirds of these had been produced by the breeder flock financed by the plaintiff, and were earmarked for range flocks to be financed by the plaintiff.

### 11.

On March 13, 1959, R. C. Paull flew to Kansas City, Missouri, at the request and expense of Mel Miller, an independent poultry consultant. Miller had been retained by the plaintiff to analyze its poultry operations. Miller and Paull were acquaintances of long standing, and Miller discussed with Paull the plaintiff's present operations and the possibility for expansion in northwest Arkansas.

### 12.

Upon returning to Berryville, Paull was informed by Rex Villines that he (Villines) had received a telephone call from the plaintiff cancelling its entire 1959 feed financing program in northwest Arkansas. A telegram containing the same information was received by Jack Stewart from the plaintiff. The following day R. C. Paull and Louis Flentge each received letters dated March 13, 1959, terminating their feed financing program for 1959.

Upon receiving this note, R. C. Paull, acting for himself, the hatchery, and the Poor Boy Feed Company, attempted to make other arrangements for financ-

ing the 1959 range turkey program, but to no avail. Commercial banks generally do not engage in such financing, and the other feed manufacturers operating in the area had already allocated their available funds for the 1959 turkey season, and therefore could not extend financing to Paull individually or to the Poor Boy Feed Company. It is the practice of the turkey feed manufacturing companies to allocate the funds available for financing turkey flocks prior to January 1 of each year.

The hatchery attempted to sell the poults produced from eggs set and being hatched under and in accordance with the Archer-Daniels-Midland turkey program as they were hatched. However, the hatchery was only able to sell 20,000 of the poults, and these were sold at 12 cents each. No additional poults could be sold because additional financing was not available at that late date, and the growers who were already financed had made prior arrangements with other hatcheries for their poults. The hatchery later attempted to give poults away, but could not find any takers. Subsequently 40,000 of the poults were drowned.

The breeding flock, owned by the hatchery and financed by the plaintiff, produced a total of 142,000 eggs. Since there was now no market for poults after the cancellation of financing by the plaintiff, approximately 50,000 of these eggs were never hatched but rather were fed to hogs owned by R. C. Paull.

At the time of the termination of plaintiff's feed financing program, R. C. Paull, Poor Boy Feed Company, and Paull's Hatchery, Inc., were ready, willing and able to perform the contract agreements.

### 13.

On March 27, 1959, Meinhoefer, Burson, Dameron, and Mel Miller called upon R. C. Paull at Berryville. Meinhoefer expressed surprise when informed by Paull that Nichols, acting for the plaintiff, had canceled the 1959 turkey financ-

ing program in northwest Arkansas. However, Meinhoefer stated that he felt the financing of the Poor Boy Feed Company should be dropped, but that other arrangements could be worked out for the financing of Paull individually. After discussion, it was tentatively agreed between Paull and Meinhoefer that the plaintiff would finance 40,000 range turkeys for Paull individually during 1959 and would also finance Paull's hog raising operations. At the request of Paull, Meinhoefer was to confirm the agreements by letter.

A few days after Meinhoefer departed for Minneapolis, F. H. Nichols called upon Paull in Berryville. Nichols discussed payment of Paull's two notes representing the balance owed plaintiff on the 1958 turkey growing program by Paull individually and by the Poor Boy Feed Company. Paull insisted that he could not make payment on the notes unless plaintiff agreed to finance his 1959 range turkey program. The tentative agreement reached at the March 27, 1959, meeting by Paull and Meinhoefer was discussed.

On April 6, 1959, Meinhoefer wrote Paull a letter stating his version of the agreements reached at the March 27, 1959 meeting. No mention was made in the letter of the plaintiff's financing Paull's hog operations. Paull refused to accept the terms set forth in the letter and rejected the offer contained therein.

### 14.

By late March 1960 the breeder flock owned by Paull's Hatchery, Inc., and financed by the plaintiff had consumed feed and medication in excess of the agreed amount of $6 per bird. Plaintiff then cut off additional credit deliveries of feed for this flock.

In early May 1960, Paull's Hatchery, Inc., sold the breeder flock financed by plaintiff and received a check payable to the hatchery and the plaintiff jointly. R. C. Paull endorsed the check for the hatchery and forwarded it to the plaintiff. Plaintiff credited the amount of

the check against the balance owed by the hatchery on the breeder flock financing.

### 15.

On June 4, 1959, Louis Flentge and his wife, Dorothy Flentge, filed a petition in voluntary bankruptcy in this court. The real estate owned by the Flentges was mortgaged to the plaintiff, and at Nichols' suggestion the Flentges deeded all of it to the plaintiff corporation rather than have the plaintiff foreclose on it.

In addition to the secured claims, the plaintiff filed two unsecured claims against the Flentges. One was for $2,-108.95, representing the balance due on Flentge's personal feed account. The second was $11,154.64, and was evidenced by the note executed jointly by Flentge and Paull. This note represented the balance due the plaintiff on the Poor Boy feed account for the 1958 turkey season. Both unsecured claims were allowed by the Referee, and dividends totalling $152.07 were paid the plaintiff. The plaintiff credited the $152.07 against the personal account of Flentge, and none of the proceeds of the dividends were credited to the Poor Boy note.

### 16.

R. C. Paull individually raised 40,000 range turkeys in 1959 under a financing plan with Nutrina Mills. The turkeys were marketed in October, November, and December of 1959, and Paull made a net profit of $51,000 on the 40,000 turkeys.

The average net profit per range turkey earned by turkey growers in northwest Arkansas for the 1959 growing season was $1.25 per turkey.

### 17.

R. C. Paull individually is indebted to the plaintiff in the principal sum of $18,-911.14, plus 6 percent interest from January 29, 1959. This indebtedness is evidenced by two notes dated January 28, 1959, and January 29, 1959. The first note in the principal sum of $11,154.64 was signed jointly by R. C. Paull and Louis Flentge, and represents the balance due the plaintiff from the Poor Boy Feed Company for financing advanced in the 1958 turkey growing season. No payment has been made on this note. The second note is in the principal sum of $8,156.50, and represents the balance owed the plaintiff by Paull individually for financing advanced during the 1958 turkey season. There is a balance due of $7,756.50 on this note, plus interest.

### 18.

Paull's Hatchery, Inc., is indebted to the plaintiff in the principal sum of $16,-322.93, with interest on $6,689.05 thereof from December 9, 1958, and with interest on $4,974.61 thereof from December 10, 1958, and with interest on $4,-659.27 thereof from December 22, 1958. This indebtedness represents the balance due the plaintiff from Paull's Hatchery, Inc., for financing advanced on its 1959 turkey breeder flock.

R. C. Paull and Virginia Paull are jointly and severally liable with Paull's Hatchery, Inc., for this amount by virtue of a guaranty agreement executed June 25, 1957.

### 19.

The defendant and counterclaimant, R. C. Paull, individually was damaged by plaintiff's refusal to perform its contractual obligations to finance the 1959 range turkey program of R. C. Paull in the amount of $25,000. This figure represents a loss of $1.25 per range turkey which Paull would have earned during 1959 on the 20,000 range turkeys he would have raised individually.

### 20.

The Poor Boy Feed Company, a joint venture of R. C. Paull and Louis Flentge, was damaged by plaintiff's refusal to perform its contractual obligations to finance the 1959 range turkey program of the Poor Boy Feed Company in the amount of $50,000. This figure represents a loss of $1.25 per range turkey which the Poor Boy Feed Company would have earned during 1959 on the

40,000 range turkeys it would have raised.

21.

Paull's Hatchery, Inc., was damaged by plaintiff's refusal to perform its contractual obligations to pay for 40,000 poults on behalf of the Poor Boy Feed Company as a part of its 1959 range turkey program in the amount of $17,200. This figure represents the contract price of 50 cents per poult for 40,000 poults, less the 12 cents per poult which the hatchery received for 20,000 poults sold in mitigation of damages, and less the 2 cents per poult boxing expense saved on the remaining 20,000 poults.

## Discussion

■ The principal questions involved in a determination of this case are ones of fact. The law involved is primarily elementary contract law, which principles need not be stated by the court. It is sufficient to say that the court has found, insofar as the counterclaims are concerned, that valid oral contracts were made between the plaintiff, acting through its authorized agents, and Paull's Hatchery, Inc., the Poor Boy Feed Company, and R. C. Paull, individually. The plaintiff does not contend that its agent, found by the court to have entered into the contract on behalf of the corporation, lacked authority to so do. It is further noted that the plaintiff has raised no defense as to the statute of frauds.

Once it has been determined by the court that valid contracts existed between the plaintiff and the hatchery, the Poor Boy Feed Company, and Paull, individually, it cannot be disputed that the plaintiff refused to perform its contractual obligations. The only semblance of a justification advanced by plaintiff for refusing to perform the contracts was that it "understood" through various "sources" that Paull and Flentge were demanding additional concessions from the plaintiff before carrying out their part of the 1959 turkey program. However, neither Meinhoefer, Anderson, nor Nichols, the executives of the plaintiff corporation primarily concerned, testi-

fied that Flentge or Paull informed them of such demands. It is further noted that plaintiff took no steps to ascertain the actual existence of such rumored demands though it was the custom between the parties to make extensive use of long distance telephone calls.

■ The defendant hatchery also contends that there was a valid oral contract made between plaintiff, Rex Villines, Jack Stewart, and Paull's Hatchery, Inc., whereby plaintiff would finance 30,000 range turkeys each for Villines and Stewart with the hatchery to furnish the poults at 60 cents each to be paid for by the plaintiff on behalf of Villines and Stewart. The breeder flock owned by the hatchery and financed by the plaintiff would have produced sufficient eggs to provide poults for Villines and Stewart in addition to those which were to be supplied to Poor Boy Feed Company. However, the testimony of the witnesses was not sufficient to convince the court that there had been a meeting of the minds as to this agreement. Letters from Villines and Stewart written in January and early March of 1959 further negative this contention. Therefore, the court is unable to find that such a multi-party agreement existed. However, the court makes no finding as to whether or not there were separate agreements reached between plaintiff and Villines or plaintiff and Stewart in regard to financing arrangements for the 1959 turkey season.

■ The counterclaim of R. C. Paull in the instant case presents the problem of damages sustained for loss of future profits. In Arkansas, a recovery is allowed for profits prevented through breach of contract. Two of the leading cases are 555 Inc. v. Leming, 1932, 185 Ark. 13, 45 S.W.2d 18; and St. Louis-San Francisco Ry. Co. v. Spradley, 1939, 199 Ark. 174, 133 S.W.2d 5. In the Leming case the court said at page 17 of 185 Ark., at page 20 of 45 S.W.2d:

" * * * It is well settled that before recovery may be had for prospective profits the evidence should

be such as to establish the amount of profits expected with a reasonable degree of certainty, and a mere estimate that so much profit would have been made, without facts shown upon which that estimate is based, is not sufficient. S. W. Tel., etc., Co. v. Memphis Tel. Co., 111 Ark. 474, 163 S.W. 1153; Johnson v. Inman, 134 Ark. 345, 203 S.W. 836; Marvel Light, etc., Co. v. Gen. Electric Co., 162 Ark. 467, 259 S.W. 741."

In the Spradley case, the court said at page 180 of 199 Ark., at page 8 of 133 S.W.2d:

"The authorities generally recognize that a recovery will lie for profits prevented through breach of contract, or by reason of a defendant's tortious acts. There is the *condition*, however, that the profits claimed to have been lost would reasonably have been realized except for the defendant's wrongful conduct. The views expressed in earlier American and English decisions, excluding profits altogether as an element of recoverable damages in such actions, are no longer followed. 15 American Jurisprudence, Sec. 149. The same authority (Sec. 150) says that to warrant a recovery in such circumstances, profits must be capable of proof with reasonable certainty, and no recovery can be had for loss of profits which are uncertain, contingent, conjectural, or speculative. In Pollock v. Gantt, 69 Ala. 373, 44 Am.Rep. 519; Jones v. Call, 96 N.C. 337, 2 S.E. 647, 60 Am.Rep. 416; Houston & T. C. R. Co. v. Hill, 63 Tex. 381, 51 Am.Rep. 642, it was held that estimated profits of [the businesses in question] were too speculative and remote.

"In the American Law Institute's Restatement of the Law of Contracts § 331 it is said that damages are recoverable for profits prevented by the breach of a contract only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.

"In an opinion of this court—Western Union Telegraph Co. v. Caldwell, 133 Ark. 184, 202 S.W. 232, 233, L.R.A.1918D, 121—it was said: 'Profits to be recovered must be such as would have accrued and grown out of the contract itself as the direct and immediate result of its fulfillment. Profits cannot be recovered as damages if they result from an independent and collateral undertaking, although entered into on the faith of the principal contract.' The controversy in the Caldwell case arose through failure to deliver a telegram."

■ In the instant case we are concerned with loss of profits arising from the plaintiff's breach of contract to extend credit and loan money to defendant Paull and Poor Boy Feed Company for the 1959 turkey growing season. The court recognizes that the general rule in such a case is that in the absence of the existence of any special circumstances, when they may reasonably be supposed to have been within the contemplation of the parties when the contract was made, the measure of damages for breach of an agreement to loan money is the difference, if any, between the interest that the borrower contracted to pay and what he was compelled to pay to procure the money, not exceeding, perhaps, the highest rate allowed by law or the general prevailing rate, since in legal contemplation money is always in the market and procurable at the lawful rate of interest. 15 Am.Jur., Damages, Sec. 61.

However, in the following section, 15 Am.Jur., Damages, Sec. 62, it is stated:

"On breach of a contract to loan money where special circumstances were known to both parties from which it must have been apparent that special damages would be suffered from a failure to fulfill the obligation, such special damages as may appear to have been reasonably contemplated by the parties are re-

coverable. Thus, special damages may be recovered where the money is to be used for a particular purpose which is known at the time to the party agreeing to make the loan, provided, of course, that such damages are not speculative or remote. A recovery may be had for profits lost by reason of the breach of such a contract where they were reasonably within the contemplation of the parties and for mental anguish where it is the natural result of the breach of the contract, or may reasonably be supposed to have been within the contemplation of the parties when it was made."

Likewise, in Sec. 154 of the same work, it is stated:

"Thus, as a rule, on breach of contract to pay or loan money, no recovery can be had for loss of profits which might have accrued to the plaintiff by the use of the money especially where they are uncertain, remote, and speculative. However, on breach of a contract to lend money for a particular purpose, profits reasonably within the contemplation of the parties at the time the contract was made and lost by reason of the breach may be recovered if capable of legal ascertainment."

In the present case all of the parties were experienced in the process of financing and growing turkeys. The credit and money to be advanced by the plaintiff was to go for a specific purpose—raising a certain type and number of turkeys. It was contemplated by the parties that all concerned would reap a profit: the plaintiff by selling feed and medication for the turkeys, and the growers by marketing the birds at a price in excess of the cost of raising them. It should likewise have been reasonably contemplated by all parties that a breach of the agreement to finance the growing of the turkeys would result in a loss of the anticipated profits by the growers. Therefore, R. C. Paull is entitled to recover profits lost as a result of plaintiff's failure to perform its contract with him to finance the growing of range turkeys during 1959. Likewise, the defendant Paull in his capacity as liquidating partner in the Poor Boy Feed Company, a joint venture, is entitled to recover the profit that the joint venture would have realized had the contract of plaintiff with the joint venture not been repudiated and canceled by the plaintiff.

The damages sustained by Paull individually and by the Poor Boy Feed Company for the loss of anticipated profits can be calculated with reasonable certainty. From the turkey growers' viewpoint, 1959 was a profitable year. R. C. Paull individually raised 40,000 of the same type turkeys, using a different but similar feed, and this operation netted him $51,000 for an average of slightly over $1.25 per turkey. Other growers in the Berryville area raising the same type turkeys and with substantially similar facilities, and conducting their businesses in a similar manner, earned net profits of $1.20 to $1.32 per turkey in 1959.

The final problem which must be considered in this case is the question of whether or not R. C. Paull can recover the full amount of damages sustained by the Poor Boy Feed Company, a joint venture between Paull and Louis Flentge. Neither the Poor Boy Feed Company nor Louis Flentge are parties to this action. Flentge filed a petition in voluntary bankruptcy on June 4, 1959, subsequent to the plaintiff's breach of contract in March 1959. Flentge was granted a discharge in bankruptcy on January 11, 1960, and an order closing the bankruptcy estate was entered by the Referee on May 12, 1960. The possible cause of action for breach of contract against the plaintiff was not listed in the schedules as an asset of Louis Flentge.

In actions against third parties the rights, duties and liabilities of joint adventurers are governed in general by rules that are similar or analogous to those which govern the corresponding rights, duties and liabilities of partners, except as they are limited by the fact that

the scope of a joint venture is narrower than that of the ordinary partnership. See 30 Am.Jur., Joint Adventurers, Sec. 55.

■ It is recognized as a general rule that all members of the joint adventure should be joined as parties just as all partners in a partnership are generally regarded as necessary parties. See 48 C.J.S. Joint Adventures § 16. The effect of insolvency or bankruptcy of one partner is discussed in 40 Am.Jur., Partnership, Sec. 255, in the following manner:

"While it has been held that insolvency does not, of itself, invariably work a dissolution, it is well settled that in the absence of a controlling agreement either the bankruptcy or the insolvency of an individual partner, when decreed by a competent tribunal, dissolves the copartnership. Such a dissolution, it has been intimated, creates the same situation as if the bankrupt partner were dead, and the solvent partner becomes in effect a surviving partner. And where a partnership has been dissolved by the bankruptcy or legal insolvency of one or more, but not all, of the individual partners, the rule is that the solvent or surviving partner or partners retain their full right, power and authority over the partnership property after the bankruptcy or insolvency, although such authority is clothed with a trust that it will be applied by the solvent partner or partners to the discharge of the partnership obligations, and that there will be an accounting to the bankrupt or insolvent partner, or to his assigns or trustee in bankruptcy or insolvency, for his share of the surplus."

See, also, 1 Collier on Bankruptcy, Sec. 5.36.

■ Therefore, it must be recognized that R. C. Paull as the surviving or liquidating partner of the Poor Boy Feed Company had authority to wind up the affairs of the Poor Boy Feed Company, including the authority to bring actions on contracts. It should further be noted that in the instant case the plaintiff, Archer-Daniels-Midland Company, made no objection as to the authority of Paull to assert the counterclaim based upon a breach of contract between the plaintiff and the Poor Boy Feed Company.

■ Flentge's share of the possible proceeds of an action arising upon a contract passed to the trustee as an asset of his bankruptcy estate on the date of the filing of the bankruptcy petition, and it was not necessary that the possible rights upon the contract should have been included in his schedule of assets. 11 U.S. C.A. § 110, sub. a(6); 4 Collier on Bankruptcy, Secs. 70.05 and 70.07.

■ The trustee is not bound to accept a burdensome right of action and pursue it to a litigious but unprofitable conclusion. If a right of action is rejected or abandoned by the trustee, title thereto reverts to the bankrupt and he may then prosecute it if he so desires. However, a trustee cannot be deemed to have abandoned as burdensome a right of action which was not scheduled or disclosed to him. 4 Collier on Bankruptcy, Sec. 70.28.

■ Therefore, Flentge's share of any recovery obtained by R. C. Paull as liquidating partner of the Poor Boy Feed Company must be considered as an unadministered asset of Flentge's bankruptcy estate for the benefit of such creditors as may be entitled thereto.

### Conclusions of Law

**1.**

The court has jurisdiction of the subject matter and the parties thereto. 28 U.S.C.A. § 1332(a)(1), (Supp.1959).

**2.**

The agents and representatives of plaintiff in negotiating the contracts sued upon in the defendants' counterclaims acted within the scope of their employment, and the agreements entered into by

the parties constitute and are valid contracts of the plaintiff corporation.

### 3.

R. C. Paull, as liquidating partner of the Poor Boy Feed Company, is entitled to recover from the plaintiff $50,000 on behalf of the joint venture. Poor Boy Feed Company is indebted to the plaintiff in the total amount of $12,318.52, which includes the principal debt of $11,154.64, and interest from January 28, 1959, to the date of judgment. The plaintiff is also entitled to recover, under the provisions of the note, a reasonable attorneys' fee, which the court hereby fixes at 10 percent of the principal amount due on the note, or $1,115.46. When the Poor Boy Feed Company debt, including the attorneys' fee, is offset against the amount due Poor Boy, it results in a net recovery of $36,566.02 by R. C. Paull as liquidating partner of the Poor Boy Feed Company.

The recovery of Paull, as liquidating partner of the Poor Boy Feed Company, is clothed with a trust that it will be applied by Paull to the discharge of the obligations of the Poor Boy Feed Company, if any, and that there will be an accounting to the bankrupt, Louis G. Flentge, in trust for the creditors of his bankruptcy estate pending the reopening of said estate, or that there will be an accounting to the trustee in bankruptcy upon a reopening of the bankruptcy estate, as to Flentge's share of the surplus. Therefore, R. C. Paull, as liquidating partner of the Poor Boy Feed Company, should have judgment against the plaintiff for $36,566.02.

### 4.

R. C. Paull, individually, is entitled to recover from the plaintiff a total of $25,000. Paull, individually, is indebted to the plaintiff in the sum of $8,562.95, which includes the balance due on the principal debt, and interest at 6 percent from January 29, 1959, to the date of judgment. The plaintiff is also entitled to recover, under the provisions of the note, a reasonable attorneys' fee, which the court fixes at 10 percent of the principal amount due on the note, or $775.65. When Paull's individual debt, including the attorneys' fee, is offset against the amount due Paull individually, it results in a net recovery of $15,661.40 for R. C. Paull individually. R. C. Paull should therefore have judgment against the plaintiff for $15,661.40.

### 5.

Paull's Hatchery, Inc., is entitled to recover from the plaintiff a total amount of $17,200. However, the hatchery is indebted to the plaintiff in the total amount of $18,151.47 representing the principal sum due on notes of $16,322.93, and interest as noted in Finding of Fact No. 18, computed to the date of judgment. The plaintiff is also entitled to recover, under the provisions of the notes, a reasonable attorneys' fee, which the court fixes at 10 percent of the principal amount due on the note, or $1,632.29. When the amount Paull's Hatchery, Inc., is entitled to recover from the plaintiff is offset against its debt due the plaintiff, including attorneys' fee, there remains a balance of $2,583.76 due the plaintiff for which Paull's Hatchery, Inc., is liable and for which R. C. Paull and Virginia Paull are liable as guarantors. Therefore, Archer-Daniels-Midland Company should have judgment against Paull's Hatchery, Inc., R. C. Paull and Virginia Paull, in the sum of $2,583.76.