ARCHER-DANIELS-MIDLAND COM-
PANY, Appellant,

v.

R. C. PAULL, Virginia Paull and Paull's
Hatchery, Inc., Appellees.

No. 16709.

United States Court of Appeals
Eighth Circuit.

Aug. 4, 1961.

Rehearing Denied Sept. 13, 1961.

Wright W. Brooks, Minneapolis, Minn.,
Garvin Fitton, Harrison, Ark., for appel-
lant.

James Blair, Crouch, Jones, Blair &
Cypert, Springdale, Ark., and J. E. Simp-
son, Berryville, Ark., for appellees.

Before SANBORN, VOGEL and VAN
OOSTERHOUT, Circuit Judges.

SANBORN, Circuit Judge.

Archer-Daniels-Midland       Company
(hereinafter referred to as "ADM"), a
Delaware corporation with its principal
place of business in Minneapolis, Minne-
sota, has appealed from so much of the
judgment in this nonjury case as award-
ed damages to R. C. Paull and Paull's
Hatchery, Inc., of Berryville, Arkansas,
upon counterclaims asserted by them, and
required ADM to bear its own costs.

The action was brought by ADM in the
spring of 1960 against R. C. Paull, Vir-
ginia Paull, and Paull's Hatchery, Inc.,
(an Arkansas corporation) to recover the
amount alleged to be due on certain prom-
issory notes signed or guaranteed by
them.  In its amended complaint ADM
asked for judgment against R. C. Paull
for $35,234.07 with interest, and judg-
ment against Virginia Paull and Paull's
Hatchery, Inc., for $16,322.93 with inter-
est.  Jurisdiction was based on diversity
of citizenship and amount in controversy.

The defendant R. C. Paull in his an-
swer, filed June 20, 1960, denied that he
was indebted to the plaintiff on the notes
signed by him, and denied their validity.
He set up a counterclaim asserting that
ADM contracted to finance him for the
year 1959 in the growing of 40,000
bronze-breasted turkeys, to be raised on
range, in consideration of his agreeing
to feed the turkeys with feed produced
by ADM and to use other items produced

by it for the growing of turkeys; that he did everything necessary for raising the turkeys, and was ready, willing and able to perform the contract, but that ADM, upon demand for performance, failed to provide financing; that the profit made on bronze-breasted turkeys in northern Arkansas in 1959 was $1.50 per head and that he was damaged by the plaintiff's breach of its contract to finance the raising of turkeys in the amount of $60,000. He asked for judgment in that amount against ADM.

Paull's Hatchery, Inc., in its answer, filed June 24, 1960, denied any indebtedness to the plaintiff, and set up the following counterclaim:

"1. That the plaintiff, Archer-Daniels-Midland Company, did covenant, contract and agree to purchase or to provide financing for growers in order to enable said growers to purchase 90,000 turkey poults to be hatched by the defendant, Paull's Hatchery, Inc., in the year 1959; that 50,000 poults were to be purchased at a price of 50¢ per poult and 40,000 poults were to be purchased at a price of 50¢ per poult; that the Paull's Hatchery, Inc., pursuant to this contract, had breeder turkey flocks placed with growers, Frank Snyder, Ray Ross and Lex Smith and paid all expenses necessary to provide eggs to hatch the said 90,000 turkey poults; that in excess of 140,-000 eggs were laid by said breeding flocks and brought to the hatchery owned by the defendant, Paull's Hatchery, Inc., and that the hatching of said eggs was undertaken but that the Archer-Daniels-Midland Company neglected, failed and refused to purchase or to provide financing for the purchase of said poults except for 4,600 poults which it purchased at 50¢ per poult.

"2. That the defendant, Paull's Hatchery, Inc., did everything necessary to perform said contract and was at all times ready, willing and able to perform and did perform its part of said contract agreement.

"3. That the defendant, Paull's Hatchery, Inc., was unable to sell or otherwise dispose of the poults hatched pursuant to said contract and was forced to destroy, by drowning, 40,000 turkey poults and other poults were given away or sold for nominal amounts and the unhatched eggs disposed of in a similar manner.

"4. That the breach, failure and refusal of performance by the plaintiff, Archer-Daniels-Midland Company, damaged this defendant, Paull's Hatchery, Inc., in the amount of $47,700.00.

"Wherefore, the defendant, Paull's Hatchery, Inc., having fully answered herein, prays that the plaintiff's amended complaint be dismissed; that it have judgment against the plaintiff, Archer-Daniels-Midland Company, on its counterclaim in the amount of $47,700.00, interest and its costs herein expended and for such other relief as to which it may prove itself entitled."

Virginia Paull in her answer denied that she was indebted to the plaintiff.

ADM on June 28, 1960, filed its answers to the counterclaims of R. C. Paull and Paull's Hatchery, Inc., denying that it was in any way indebted to either defendant.

On September 14, 1960, the day trial commenced, the defendant R. C. Paull, by amendment to the counterclaim set up in his answer filed on June 20, 1960, added a Count II reading as follows:

"1. That the plaintiff, Archer-Daniels-Midland Company, did in fact covenant, contract, and agree to finance Poor Boy Feed Company in the growing of 40,000 bronze breasted turkeys, to be raised on range in the year 1959 in consideration of Poor Boy Feed Company's promise to feed said turkeys, feed produced solely by the plaintiff, and to use other items produced by the plaintiff necessary for the growing of turkeys.

"2. That Poor Boy Feed Company, a joint venture between one

Louis Flentge and R. C. Paull, did everything necessary for the raising of said turkeys and was at all times ready, willing and able to perform said contract agreement but that the plaintiff, upon demand for performance of said contract, neglected, refused and failed to provide said financing, and that the defendant, R. C. Paull, has been damaged by this breach of contract on the part of the plaintiff in the amount of $60,000.00.

"Wherefore, the defendant and counter-claimant having fully answered herein, prays that the plaintiff's amended complaint be dismissed; that he have judgment against the plaintiff, Archer-Daniels-Midland Company, on his counterclaim in the amount of $120,000.00, for his costs herein expended and for such other relief as to which he may prove himself entitled."

At the beginning of trial the defendants stipulated "that the documents and exhibits attached to the plaintiff's complaint and amended complaint were in fact executed by the persons whose signatures are shown thereon and that the credits set forth in the plaintiff's complaint and amended complaint are proper credits of payments which were made on various obligations."

The case was tried on September 14 and 15, 1960, and was submitted upon the evidence adduced and briefs filed by counsel at the direction of the trial court.

On October 26, 1960, the trial court filed a statement of the issues, together with elaborate findings of fact, conclusions of law, and a memorandum opinion. 188 F.Supp. 277.

The court pointed out that the action arose from ADM's turkey financing program in northwest Arkansas for the years 1958 and 1959, that recovery was sought (1) on notes executed by R. C. Paull, which represented the loss incurred in 1958 by him individually and by Poor Boy Feed Company, a joint venture created by Paull and Louis Flentge in January, 1958, for raising turkeys financed by

ADM; and (2) for financing advanced by ADM to Paull's Hatchery, Inc., for its 1959 turkey breeder flocks. The court also pointed out that R. C. Paull contended that ADM contracted to finance him individually for the growing of 20,000 range turkeys during 1959, and to finance the growing of 40,000 range turkeys in that year for the Poor Boy Feed Company, and that ADM had breached these contracts. The court further pointed out that Paull's Hatchery, Inc., in its counterclaim contended that ADM had contracted to provide the financing necessary to enable growers (farmers with whom turkey poults were placed to be raised to maturity) to purchase 90,000 poults to be hatched by the Hatchery.

In its findings the trial court described the method of financing the raising of turkeys by ADM as follows:

"The plaintiff conducted its turkey financing program in the customary fashion. It would receive a comprehensive financial statement from a grower upon commencing to do business with him. After the grower was once approved, the plaintiff would agree each year to finance up to a specified number of turkeys for the grower at a specified dollar amount per bird. As an example, the plaintiff might agree to finance for Farmer Jones 10,000 turkeys at up to $3.00 per turkey. The grower in turn agreed to use plaintiff's products exclusively in the growing of the flocks so financed. Upon receipt of the poults (baby turkeys) from the hatchery, the grower would execute a separate application on each flock indicating the number and type of turkeys in the flock and the location where they were to be raised. This enabled the plaintiff to keep track of the location of turkeys financed by it, and to determine production requirements of its mill. As each new flock was placed, the plaintiff would deduct the number of turkeys in the flock from its general commitment for the year. The grower would also execute a chattel

mortgage covering the flock at this time. The plaintiff would pay the hatchery for the poults on behalf of the grower, and would also provide feed and medication up to the dollar limit for each turkey. When the turkeys were marketed, the processor would issue a check to the grower and the plaintiff jointly. The grower would endorse the check and forward it to the plaintiff who would deposit it. The plaintiff would then deduct the cost of the financing advanced on that particular flock, and would send the grower a check for the balance, if any."

The controverted issues arose out of the counterclaims asserted by the defendants R. C. Paull and Paull's Hatchery, Inc. Those issues were: 1. Whether ADM had, in November 1958, entered into complete and binding oral contracts (a) to finance R. C. Paull during 1959 in the raising of 20,000 range turkeys, (b) to finance Poor Boy Feed Company in raising 40,000 range turkeys, and (c) to finance the purchase from Paull's Hatchery, Inc., of 90,000 turkey poults, as alleged in its counterclaim. 2. Whether, if such financing contracts were entered into, the failure of ADM to perform them entitled the counterclaimants to damages measured by the profits they might or would have made had the contracts been fully performed by ADM.

How these issues were resolved by the trial court is indicated by its judgment. The judgment determined: (1) that ADM was indebted to R. C. Paull, as liquidating partner of Poor Boy Feed Company, in the sum of $50,000.00 damages for breach of contract, less $13,433.-98 indebtedness of Poor Boy Feed Company to ADM—the net amount due from ADM being $36,566.02; (2) that ADM was indebted to R. C. Paull, as an individual, for damages for breach of contract in the sum of $25,000.00, less $9,338.60 indebtedness of Paull to ADM, leaving a net amount due Paull of $15,661.40; (3) that ADM was indebted to Paull's Hatchery, Inc., for $17,200.00 damages for breach of contract, and that Paull's

Hatchery, Inc., was indebted to ADM in the sum of $19,783.76, so that ADM is entitled to judgment against the Hatchery and R. C. Paull and Virginia Paull, as its guarantors, for $2,583.76. By the terms of the judgment, R. C. Paull recovers the net amount of $52,227.42 from ADM because of the breach of its alleged contracts to finance the raising of turkeys by him and by Poor Boy Feed Company; and ADM recovers $2,583.76 from Paull's Hatchery, Inc., and R. C. Paull and Virginia Paull, guarantors on its notes to ADM.

The $25,000 damages awarded R. C. Paull for the failure of ADM to finance his program to raise 20,000 turkeys in 1959 was based upon a finding that he would have made a profit of $1.25 per turkey had the financing been forthcoming. The $50,000 damages awarded R. C. Paull, as liquidating partner of the Poor Boy Feed Company, against ADM represents a claimed loss of profits of $1.25 per head on 40,000 turkeys which that joint venture could not and did not raise.

The finding of the trial court with respect to the damages suffered by Paull's Hatchery, Inc., reads as follows:

"21.

"Paul's Hatchery, Inc., was damaged by plaintiff's refusal to perform its contractual obligations to pay for 40,000 poults on behalf of the Poor Boy Feed Company as a part of its 1959 range turkey program in the amount of $17,200. This figure represents the contract price of 50 cents per poult for 40,000 poults, less the 12 cents per poult which the hatchery received for 20,000 poults sold in mitigation of damages, and less the 2 cents per poult boxing expense saved on the remaining 20,000 poults."

█ The main contentions of ADM on this appeal are: (1) that there was an inadequate evidentiary basis for the finding that it entered into the alleged contracts to finance R. C. Paull for the raising of 20,000 turkeys during 1959, to finance Poor Boy Feed Company in rais-

ing 40,000 turkeys during that year, and to buy from Paull's Hatchery, Inc., the poults that the Feed Company would need during the year; and (2) that, if the finding that ADM entered into the alleged contracts is sustained, there is an insufficient factual and legal basis for the damages awarded R. C. Paull and Paull's Hatchery, Inc., upon their counterclaims.

The trial court found that in November, 1958, there was a meeting in Berryville, Arkansas, to discuss plans for the financing by ADM of the raising of turkeys during the 1959 season; that there were present at this meeting R. C. Paull, Louis Flentge and Rex Villines, a local turkey grower and feed dealer; that ADM was represented by Ferris H. Nichols, the Credit Manager of its Feed Division, Frank Burson, a regional sales manager for ADM covering Arkansas and several other states for the Feed Division, and Leroy Dameron, territory manager with ADM for Springfield, Missouri, and Arkansas; that it was agreed at that meeting that ADM would finance the growing of 40,000 range turkeys at up to $3.75 a bird for the Poor Boy Feed Company during the 1959 season, with the understanding that ADM products were to be used exclusively in growing the turkeys; that Paull's Hatchery, Inc., was to furnish the turkey poults at 50 cents each, and was to be paid by ADM on behalf of Poor Boy Feed Company for the poults—the poult cost to be included in the $3.75 total financing per turkey; that other details were to be on the same basis as the 1958 program; that ADM also agreed to finance the growing of 20,000 range turkeys for R. C. Paull individually

during the 1959 season on the same basis as for the Poor Boy Feed Company, except that he was to secure his own poults, which were not to come from the breeder flock financed by ADM; that ADM further agreed to finance the breeder flock for Paull's Hatchery, Inc., "and to assist in selecting the hens for the flock so as to attempt to circumvent the losses incurred during the 1958 season resulting from poor quality breeder hens"; and the court found that "F. H. Nichols acted on behalf of the plaintiff in making the above agreements, with the consent and approval of the superior officials of plaintiff."

Had this case been tried to a jury, and had ADM moved for a directed verdict in its favor on the counterclaims at the close of the evidence, on the ground that it conclusively appeared that ADM had not entered into any such oral agreements as the court found ADM had made with the counterclaimants in November, 1958, for the raising of turkeys in 1959, we think the court would not have erred in denying the motion. In other words, under the evidence we regard the question of the existence or nonexistence of the alleged contracts as a doubtful question of fact for the trier of the facts, which in this case was the trial court. We cannot rule that its determination of this issue was clearly erroneous, even though the evidence would have sustained a contrary finding. A letter from Ferris H. Nichols, Division Credit Manager for ADM, to Paull and Flentge, dated February 4, 1959, which the trial court regarded as confirmatory of the oral contracts alleged to have been made in November, 1958, is set forth in the margin.[1]

1. "No doubt Frank Burson has been in touch with you by telephone to advise you that we are prepared to go along with your partnership operation for the year 1959 for the feeding of not more than 40,000 turkey broilers and not more than 40,000 range turkeys. The clearance of the various growing flock accounts will be handled in much the same manner as we did last year which means that we will require a separate mortgage signed by both of you on each flock placed, and that the credit limit will be set for turkey Beltsville broilers of $1.50 and for the

range turkeys at $3.75 per mature bird. This credit may be used to finance the cost of the poults of not more than 40¢ per poult for the turkey broilers and not more than 50¢ per poult for the range turkeys or heavy breed type. We will continue to permit the markup of the feed at $4.00 per ton over the Hollister invoice price. This margin is recognized to offset the trucking and delivery cost of feed to the various growing flocks.

"Under separate letters we are approving the Clay [R. C.] Paull broilers flock No. 1 for 4,000 Beltsvilles which are

On March 13, 1959, Ferris H. Nichols, Division Credit Manager for ADM, wrote R. C. Paull and Louis Flentge each a letter about their proposed turkey finance program, stating:

"We have carefully considered your proposed program and in view of the rather lean turkey market presently being forecast for 1959 we have decided we do not wish to extend any additional turkey financing for 1959.

"We will, of course, complete the financing on any flocks already started on which applications have been submitted and approved by us.

"In arriving at our decision we, of course, have to take into consideration the market risk and the amount of money we have tied up and at present this does not figure out favorably for us.

"If you decide to continue raising turkeys this year I hope you can arrange your financing with PCA or through some bank.

"We do want you to know that we have a high regard for you and that we wish to continue to serve you on our regular terms of 1% cash discount for payment within 10 days, net 30 days.

"With best wishes and kindest personal regards."

R. C. Paull testified: "Those letters closed Poor Boy. That closed the entire operations." An attempt thereafter to have ADM finance Paull individually with respect to his entire feeding operations, including the feeding of several hundred head of hogs, which Paull testified was agreed to by Clyde C. Meinhoefer, the General Manager of ADM's Feed Division, failed of fruition, apparently because ADM was unable to furnish hog feed, and Paull wished hogs that he was raising included with his turkeys in the feed financing program. No financing was furnished by ADM after March 13, 1959.

Flentge and his wife went into voluntary bankruptcy on June 4, 1959, scheduling his indebtedness to ADM among his liabilities, but not including in his schedule of assets any claim against ADM for breach of contract. He voluntarily turned over to ADM real estate upon which it held a mortgage. ADM filed unsecured claims against the Flentges aggregating $13,263.59, which were allowed and upon which it received $152.07 in dividends. Flentge was discharged in bankruptcy on January 11, 1960, and the bankruptcy estate was closed on May 12, 1960.

In its conclusions of law, the court ruled (at page 289 of 188 F.Supp.):

"The recovery of Paull, as liquidating partner of the Poor Boy Feed Company, is clothed with a trust that it will be applied by Paull to the discharge of the obligations of the Poor Boy Feed Company, if any, and that there will be an accounting to the bankrupt, Louis G. Flentge, in trust for the creditors of his bankruptcy estate pending the reopening of said estate, or that there will be an accounting to the trustee in bankruptcy upon a reopening of the bankruptcy estate, as to Flentge's share of the surplus. Therefore, R. C. Paull, as liquidating partner of the Poor Boy Feed Company, should have judgment against the plaintiff for $36,566.02."

---

being brooded and raised on the Paull farm, and also the Clay [R. C.] Paull turkey broiler flock No. 2 which is being brooded and raised on the same farm. We urge you to use every precaution to keep the feed deliveries to these two flocks properly segregated and identified by the above flock numbers so as to avoid any accounting confusion at a later date.

"As new flocks are scheduled for placement, please request LeRoy Dameron to prepare the proper feed finance application and chattel mortgage for each flock.

"We sincerely wish both of you success in the continued working arrangements which you have set up through the organization of the Poor Boy Feed Company.

"With personal regards.
"Sincerely,"

The vital question in this case is, we think, whether, under the evidence and the applicable substantive law of Arkansas, ADM can be held legally liable in damages for profits which the trial court found the defendants-counterclaimants would have earned had ADM carried out its contracts to finance their turkey-raising programs in 1959. If a feed company which (in connection with the sale of its poultry feed in Arkansas) undertakes to finance the raising of turkeys and fails or is unable to carry out its commitments in that regard, is liable in damages measured by the average profits which those with whom it contracted might or perhaps would have made as shown by what profits other turkey raisers made during the season in marketing their turkeys, we think ADM may be liable in this case for such damages as were assessed by the trial court.

In its discussion of the problem, the trial court says (at pages 286–287 of 188 F.Supp.):

"In the instant case we are concerned with loss of profits arising from the plaintiff's breach of contract to extend credit and loan money to defendant Paull and Poor Boy Feed Company for the 1959 turkey growing season. The court recognizes that the general rule in such a case is that in the absence of the existence of any special circumstances, when they may reasonably be supposed to have been within the contemplation of the parties when the contract was made, the measure of damages for breach of an agreement to loan money is the difference, if any, between the interest that the borrower contracted to pay and what he was compelled to pay to procure the money, not exceeding, perhaps, the highest rate allowed by law or the general prevailing rate, since in legal contemplation money is always in the market and procurable at the lawful rate of interest. 15 Am.Jur., Damages, Sec. 61.";

and, after quoting Sec. 154 of 15 Am.Jur., Damages,—as follows:

"Thus, as a rule, on breach of contract to pay or loan money, no recovery can be had for loss of profits which might have accrued to the plaintiff by the use of the money especially where they are uncertain, remote, and speculative. However, on breach of a contract to lend money for a particular purpose, profits reasonably within the contemplation of the parties at the time the contract was made and lost by reason of the breach may be recovered if capable of legal ascertainment."—

adds:

"In the present case all of the parties were experienced in the process of financing and growing turkeys. The credit and money to be advanced by the plaintiff was to go for a specific purpose—raising a certain type and number of turkeys. It was contemplated by the parties that all concerned would reap a profit: the plaintiff by selling feed and medication for the turkeys, and the growers by marketing the birds at a price in excess of the cost of raising them. It should likewise have been reasonably contemplated by all parties that a breach of the agreement to finance the growing of the turkeys would result in a loss of the anticipated profits by the growers. Therefore, R. C. Paull is entitled to recover profits lost as a result of plaintiff's failure to perform its contract with him to finance the growing of range turkeys during 1959. Likewise, the defendant Paull in his capacity as liquidating partner in the Poor Boy Feed Company, a joint venture, is entitled to recover the profit that the joint venture would have realized had the contract of plaintiff with the joint venture not been repudiated and canceled by the plaintiff.

"The damages sustained by Paull individually and by the Poor Boy Feed Company for the loss of anticipated profits can be calculated with reasonable certainty. From the turkey growers' viewpoint, 1959 was a

profitable year. R. C. Paull individually raised 40,000 of the same type turkeys, using a different but similar feed, and this operation netted him $51,000 for an average of slightly over $1.25 per turkey. Other growers in the Berryville area raising the same type turkeys and with substantially similar facilities, and conducting their businesses in a similar manner, earned net profits of $1.20 to $1.32 per turkey in 1959."

In Harmon v. Frye, 103 Ark. 584, 148 S.W. 269, 271, the Supreme Court of Arkansas said:

" 'A recovery of profits as in the case of damages for the breach of contracts in general depends upon whether such profits were within the contemplation of the parties at the time the contract was made, and, if they are such as grow out of the contract itself and are the direct and immediate result of its fulfillment, they form a proper item of damages.' 13 Cyc. 53, 54. Such damages 'must be certain both in their nature and in respect to the cause from which they proceed. It is against the policy of the law to allow profits as damages, where such profits are remotely connected with the breach of contract alleged, or where they are speculative, resting only upon conjectural evidence or the individual opinions of the parties or witnesses.' 13 Cyc. 53; Spencer Medicine Co. v. Hall, 78 Ark. 336, 93 S.W. 985; Beekman Lbr. Co. v. Kittrell, 80 Ark. [228,] 232, 96 S.W. 988; Hurley v. Oliver, 91 Ark. [427,] 433, 121 S.W. 920."

See, also, and compare: Spencer Medicine Co. v. Hall, 78 Ark. 336, 93 S.W. 985, 988; Beekman Lumber Co. v. Kittrell, 80 Ark. 228, 232, 96 S.W. 988, 990; S. Blumenthal & Co. v. Bridges, 91 Ark. 212, 120 S.W. 975, 976, 24 L.R.A.,N.S., 279; Streudle v. Leroy, 122 Ark. 189, 182 S.W. 898, 899; Western Union Telegraph Co. v. Caldwell, 133 Ark. 184, 202 S.W. 232, 233, L.R.A.1918D, 121; 555 Incorporated v. Leming, 185 Ark. 13, 45 S.W. 2d 18, 20; St. Louis-San Francisco Ry.

Co. v. Spradley, 199 Ark. 174, 133 S.W.2d 5, 8; Crow v. Russell, 226 Ark. 121, 289 S.W.2d 195, 197.

In Sumlin v. Woodson, 211 Ark. 214, 199 S.W.2d 936, a case in which Woodson, a landlord, sued for loss of profits resulting from the wrongful detainer of a building by Sumlin, and had a verdict for $300, the Supreme Court of Arkansas, in speaking of loss of profits as an element of recoverable damages, after referring to the rule stated in Harmon v. Frye, supra, went on to say (at page 939 of 199 S.W.2d):

" * * * In 15 Am.Juris. 560, after giving the general statements from leading cases, this rule is deduced:

" 'It has been said that the most definite rule that can be drawn from the cases would seem to be that if by any chance or under any condition of affairs then existing the profits might not have accrued though the wrongful act had not intervened, there can be no allowance of profits lost as damages; but if, except for the wrongful act, there must have been profits, notwithstanding any other circumstances existing at the time of the perpetration of the wrong, the question of their speculativeness and contingency is absolutely negatived.'

"Tested by our own cases, as well as the general rule above stated, we are convinced that the profits, claimed by Woodson in this case, were never removed from the realm of conjecture and speculation, because it is uncertain from the evidence whether any profit would ever have accrued to him. * * * "

No Arkansas case has been called to our attention, and we have found none, in which was involved a claim for damages for the loss of prospective profits due to breach of a contract or undertaking to finance the raising of poultry or of livestock, or any similar enterprise.

We are urged to affirm the judgment appealed from on the ground that in as-

sessing damages for breach of the contracts in suit the trial court has reached a permissible conclusion as to a doubtful question of local law respecting the recovery of anticipated profits as an element of damages, which conclusion this Court must or should accept. See Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 141; Homolla v. Gluck, 8 Cir., 248 F.2d 731, 733–734 and cases cited; Weiby v. Farmers Mutual Automobile Ins. Co., 8 Cir., 273 F.2d 327, 331 and cases cited.

■ Whether the conclusion of a trial court as to a question of local law is a permissible one is necessarily for this Court to decide on an appeal taken from a judgment in a diversity case governed by state law.

In Anderson v. Sanderson & Porter, 8 Cir., 146 F.2d 58, 62, we said:

"We can not, of course, say with absolute certainty that the law of Arkansas with respect to the question under consideration is not what the District Court believed it to be when the summary judgment appealed from was entered. It seems to us, however, so improbable that the conclusion of the District Court that the appellants may not maintain this action under Arkansas law is correct that we are convinced that the judgment dismissing the complaint in this case ought not to have been entered. * * * "

Compare, National Farmers Union Property & Casualty Co. v. Fisher, 8 Cir., 284 F.2d 421, 424–425.

It is not conceivable to us that at the time the contracts asserted in the counterclaims were entered into the parties could have contemplated that there was any reasonable certainty that the fulfillment of the contracts would result in profits. In 1958 the carrying out of similar contracts between the parties had resulted in severe losses to all concerned, had forced Louis Flentge into bankruptcy, and had left R. C. Paull indebted to the farmers who had grown turkeys for him and the Poor Boy Feed Company to such an extent that ADM was called upon for assistance. It seems obvious to us from the evidence that the raising of turkeys is not a stable business but a speculative one, and that profits depend upon many factors, including management, market conditions, the health of the flocks, and other contingencies.

Our conclusion is that there was not an adequate basis in the evidence for a determination by the trial court that at the time ADM agreed to finance the turkey-raising programs of the defendants-counterclaimants, the parties contemplated that profits were reasonably certain to result or that any anticipated profits were "certain both in their nature and in respect to the cause from which they" were to "proceed." That 1959 turned out to be a profitable year in Arkansas generally for turkey raisers whose flocks came through in good condition and were marketed at the proper times, does not, in our opinion, justify or require the award of any such damages, for loss of profits, as were assessed against ADM in this case because of the nonfulfillment of its contracts to finance the defendant-counterclaimants' planned turkey-raising activities during 1959.

Concededly, the measure of damages for the breach of a contract to loan money is the difference between the agreed interest rate and that which would be required to procure the money elsewhere, not exceeding the highest rate permitted by law. See Columbian Mut. Life Assur. Soc. v. Whitehead, 193 Ark. 598, 101 S.W. 2d 455.

So much of the judgment as is appealed from is reversed, and the case is remanded for the ascertainment of whatever general damages may, under applicable Arkansas law and consistently with this opinion, be due to the defendants R. C. Paull and Paull's Hatchery, Inc., upon their counterclaims.

Reversed and remanded.