Bob McBRAYER, Plaintiff-Appellee,

v.

TECKLA, INC., Defendant-Appellant,
Water Wagon, Inc., Defendant.

No. 73–3613.

United States Court of Appeals,
Fifth Circuit.

June 17, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 3, 1974.

Jerry F. Lyons, Amarillo, Tex., for defendant-appellant.

James A. Kirk, James P. Linn, Oklahoma City, Okl., for plaintiff-appellee.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a Texas diversity suit for breach of contract. Pursuant to a jury verdict in the form of answers to special issues, the district court entered judgment for the plaintiff, Bob McBrayer. On appeal, questions are presented pertaining to the sufficiency of the evidence and the appropriateness of the damages awarded. We affirm in part and reverse in part.

I.

In 1967, Bob McBrayer became acquainted with a polystyrene fishing float sold under the trade name "Water Wagon," and in 1970, he became interested in forming a company to promote and sell water wagons. On December 8, 1970, Water Wagon, Inc. was formed, with McBrayer acquiring approximately one third of the common stock of the company. By the summer of 1971, McBrayer, who was also an officer and director of the company, realized that Water Wagon needed additional capital for proper expansion, and he began discussions with a consultant to Teckla, Inc., concerning the possibility of obtaining such capital. The culmination of these discussions occurred on September 21, 1971, when McBrayer and a partner executed an agreement with Teckla whereby Teckla purchased all of the stock of Water Wagon in return for 15,000 shares of Teckla stock and $25,000. Additionally, Teckla agreed: (1) to back Water Wagon financially in the production, promotion, and sale of water wagons "in a reasonable and businesslike manner"; (2) to pay McBrayer and his partner an incentive payment of one share of Teckla common stock for each water wagon unit sold and collected for during the succeeding six years, from September 21, 1971, up to a limit of 60,000 units; in the event Teckla disposed of the assets or stock ownership of Water Wagon, payment of $2 per unit was to be made to McBrayer and his partner by Teckla for the units sold by the new owner; (3) to guarantee a sala-

ry payment by Water Wagon to Mc-Brayer of $1,000 per month for one year.

From Water Wagon's inception until the signing of the agreement with Teck-la, that is, from December 8, 1970 to September 20, 1971, approximately 392 water wagon units were sold, amid substantial national publicity. Water Wagon sales between September 21, 1971 and April 21, 1972 amounted to 669 units. Of these, 350 were sold during the first month that Teckla operated Water Wagon.

On February 21, 1972, Teckla's board of directors determined to sell the water wagon operation, and a sale was made to Canyon Plastics on March 27, 1972. In connection with the sale, Teckla assumed about $11,000 in accounts payable owed by Water Wagon, and Canyon Plastics agreed to pay a royalty to Water Wagon. Then, by letter dated March 28, 1972, the day after the sale, Teckla's president informed McBrayer that Teckla was electing to terminate their contract, including any reference to employment or royalty payments as of January 1, 1972, because Teckla felt that certain unspecified provisions of the contract had been breached. McBrayer did not receive his incentive payments for any of the 669 water wagons sold between the execution of the contract and April 21, 1972. Water Wagon paid McBrayer's contractual salary from September 21, 1971 until December 31, 1971, but neither Water Wagon nor Teckla paid McBrayer any salary after the latter date.

On May 5, 1972, McBrayer filed his complaint in this suit alleging that Teckla breached the contract of September 21, 1971 by failing to finance Water Wagon in a reasonable and businesslike manner, failing to pay McBrayer the incentive payment for each water wagon unit sold and collected for, and failing to pay McBrayer his salary. The cause was tried before a jury, and in answer to the special issues, the jury found that Teckla failed to back Water Wagon financially in the production, promotion, and sale of water wagons in a reasonable and businesslike manner; that, had Teckla not failed to back Water Wagon in a reasonable and businesslike manner, in all reasonable probability 1,000 units would have been sold and collected for between September 21, 1971 and March 27, 1972, and 45,000 units would have been sold and collected for between March 27, 1972 and November 20, 1977; that McBrayer, prior to receiving the letter from Teckla's president terminating the contract, did not fail to devote substantially his full time in behalf of Water Wagon, did not fail to conduct himself in an orderly and businesslike manner, and was not guilty of any dereliction of his duties under the contract; and that Teckla did not terminate and cancel its employment agreement with McBrayer prior to December 31, 1971.

Overruling Teckla's post-trial motions, the district court, on the basis of the jury's answers to the special issues, entered judgment for McBrayer in the sum of $46,000 for incentive payments due McBrayer for water wagons ($1 per unit) that would have been sold and collected for over the course of the contract if Teckla had financed Water Wagon in a reasonable and businesslike manner; and in the sum of $10,667 for the salary due McBrayer from January 1, 1972 to November 20, 1972. Teckla has appealed.

## II.

■ Teckla initially contends that the evidence presented at trial was insufficient to support either the jury's finding that Teckla failed to back Water Wagon financially in a reasonable and businesslike manner or its finding that McBrayer fulfilled his employment obligations. The standard properly applied by this Court on review of the jury verdict is whether there is competent evidence in the record to support it. *E. g.,* Torrence v. Union Barge Line Corporation, 5 Cir., 1969, 408 F.2d 873, 875; Ford Motor Company v. Mathis, 5 Cir., 1963, 322 F.2d 267, 271–272. "[I]t is not the function of an appellate court to weigh

conflicting evidence, judge the credibility of witnesses, and arrive at a conclusion opposite from the one reached by the jury where there is a reasonable basis in the record for the jury's verdict." United States v. Mills, 5 Cir., 1968, 399 F.2d 944, 948. Once we find an evidentiary basis for the jury's conclusions, our function is exhausted. *E. g.*, Myers v. Reading Co., 331 U.S. 477, 485–486, 67 S.Ct. 1334, 1339, 91 L.Ed. 1615 (1947). On careful review of the record, we conclude that such a basis is apparent. Here, we briefly outline the evidence on which the jury could rationally have based its conclusions.

■ Pursuant to its obligation to financially back Water Wagon, Teckla invested $10,000 in the company on October 4, 1971, in a stock purchase transaction; and, on January 27, 1972, Teckla loaned Water Wagon $4,870 by paying that amount to Canyon Plastics in settlement of Water Wagon's indebtedness to that company. Teckla points out that Water Wagon also received backing consisting of the benefit of a management consultant, office space, office furniture and equipment, part-time office help, and aid in the design of brochures and literature. At the trial, Water Wagon's accountant testified that his computations led him to believe that at the minimum $41,000 would be needed to get Water Wagon rolling and that he had so informed Teckla officials prior to execution of the contract. McBrayer testified that prior to the contract date he had informed Teckla's management consultant that $50,000 would be necessary to finance Water Wagon. There was further testimony that an attempt to obtain financial support through a public offering failed because Water Wagon could not meet the requirement set forth by the investment banker that it have a net worth of $50,000. When McBrayer refused to raise the $50,000 himself on the ground that he felt it was Teckla's contractual obligation to raise the money, further attempts to provide the financing were abandoned. In addition, a bookkeeper for Teckla and Water Wagon

testified to delayed payments of its bills by Water Wagon due to lack of money. Although Teckla offers evidence and arguments that is financing of Water Wagon was appropriate and that McBrayer failed to inform Teckla of Water Wagon's financial needs and that Teckla's financing of Water Wagon was appropriate, there clearly was a reasonable basis in the record for the jury's conclusion that Teckla's backing was not reasonable and businesslike.

With respect to McBrayer's employment obligations, the September 21, 1971 contract provided:

> Teckla reserves the right to cancel the above employment agreement only if the parties thereto do not conduct themselves in an orderly and businesslike manner or are guilty of dereliction of duties to [Water Wagon], Inc. and/or Teckla.

At the trial, there was testimony by McBrayer as to the activities he performed on behalf of Water Wagon during his employment. McBrayer also testified that he worked normal office hours, that he stayed late several nights, and that he did not recall missing any days for sickness or any other reason. Teckla, on the other hand, presented testimony that McBrayer was in his office very irregularly, and Teckla argues here that "no evidence whatsoever [was] introduced as to any specific work that McBrayer performed after February 1, 1972." In light of both parties' proof on the question, however, we cannot say that the jury lacked reasonable evidentiary basis for its conclusion that McBrayer fulfilled his employment obligations under the contract until he received the letter of discharge from Teckla's president on March 28, 1972.

Teckla sets forth two other contentions concerning its obligations under the contract. First, Teckla contends that the district court erred in refusing to instruct the jury that Teckla was entitled to consider its own financial condition in determining the meaning of a reasonable and businesslike financial

backing of Water Wagon. Teckla's argument is that the jury should have been charged that Teckla was not obligated to invest in Water Wagon whatever amount McBrayer or Water Wagon's accountant thought it should, but that Teckla was entitled to consider its own financial situation and needs. There was testimony that although Teckla had substantial cash on hand during the period in which it owned Water Wagon, the cash was committed to Teckla's primary business activity, selling recreational land in Colorado.

■■ Teckla's argument, then, pertains to the meaning of the words "in a reasonable and businesslike manner." The meaning of these words, however, is a matter of interpretation of the written instrument, a factual consideration within the province of the jury. *See* 3 A. Corbin, Contracts §§ 534, 554 (1960, Supp.1971); 4 S. Williston, Contracts §§ 602, 616 (Jaeger ed. 1961); Williams v. Humble Oil Refining Company, 5 Cir., 1970, 432 F.2d 165, 179, cert. denied, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971). Accordingly, there was no error in the district court's failure to instruct the jury further in the meaning of the term "in a reasonable and businesslike manner." *See* 1 A. Corbin, Contracts § 99, at 445 (1963). The court did not commit error in refusing to instruct the jury that Teckla was entitled to consider its own financial situation and needs in assessing its contractual obligations. *See* Nat Harrison Associates, Inc. v. Gulf States Utilities Co., 5 Cir., 1974, 491 F.2d 578, 584. *See also* 1 S. Williston, Contracts § 42 (Jaeger ed. 1957); 13 Tex.Jur.2d § 103 (1960); Sanders v. Barnaby, 166 App.Div. 274, 151 N.Y.S. 580 (1915).

■ Teckla's last assertion with respect to the contract itself is that the contract provided that Teckla's obligation to make incentive payments as well as its obligation to employ McBrayer were conditioned upon the execution of separate agreements between Water Wagon and Teckla, which were never executed. A fair reading of these provisions [1] in the context of the contract, however, reveals that the separate agreements are not conditions precedent, which must occur before remedies for breach of contract become available. *See* 3A A. Corbin, Contracts § 628 (1960, Supp.1971); 13 Tex.Jur.2d § 151 (1960, Supp.1973), and cases cited therein.

### III.

#### A. Incentive Payments

Teckla contends that the district court erred in awarding McBrayer $46,000 on the basis of the jury's estimation that 46,000 water wagons would have been sold between September 21, 1971 and November 20, 1974, if Teckla had backed Water Wagon in a reasonable and businesslike manner.

■ McBrayer's claim for lost incentive payments is basically one for recovery of profits lost under the contract due to Teckla's breach. *See* Southwest Battery Corporation v. Owen, 131 Tex. 423, 115 S.W.2d 1097 (1938). To recover profits lost due to breach of contract, reasonable certainty is required both as to the fact of damages and the amount. *E. g., id.* at 1098; 17 Tex.Jur. 2d § 143 (1960, Supp.1973). While a perfect calculation of damages need not be stated or proven, *e. g.,* Berne v. Keith, 361 S.W.2d 592 (Tex.Ct.Civ.App. 1962); Humble Oil & Refining Co. v. Luckel, 171 S.W.2d 902, 907 (Tex.Ct. Civ.App.1943), competent evidence must show that the profits claimed are neither too speculative nor too uncertain to support recovery in an amount arrived at with a reasonable degree of precision,

---

1. "The aforesaid incentive compensation agreement will be set forth in a separate instrument and executed by [Water Wagon], Inc., and Teckla at closing of this transaction.
    .      .      .      .      .

". . . The aforesaid employment contract will be set forth in a separate instrument to be executed by [Water Wagon], Inc., and Teckla at closing of this transaction."

*e. g.,* Southwest Battery Corporation v. Owen, *supra,* at 1099; Drumm Seed & Floral Co. v. J. Horace McFarland Co., 30 S.W. 93 (Tex.Ct.Civ.App.1895). A distinction is drawn, moreover, between damages to an established business and damages to a new, unestablished venture. *E. g.,* Southwest Battery Corporation v. Owen, *supra,* 115 S.W.2d at 1099. Lost profits can be recovered for damages to an established business, for the profits the business has been making at a point not too remote prior to the breach are competent evidence of profits to be anticipated at a point not too remote after the breach. *E. g., id.,* 115 S.W.2d at 1098–1099; Wissman v. Boucher, 150 Tex. 326, 240 S.W.2d 278, 281 (1951); Universal Commodities, Inc. v. Weed, 449 S.W.2d 106, 113 (Tex.Ct.Civ.App.1969); Richker v. Georgandis, 323 S.W.2d 90, 98 (Tex.Ct.Civ.App.1959). On the other hand, it is the general rule that anticipated profits that might have been made from an unestablished business are not susceptible of being measured to that degree of certainty that the law demands. *E. g.,* Southwest Battery Corporation v. Owen, *supra,* 115 S.W.2d at 1098–1099; Universal Commodities, Inc. v. Weed, *supra*; Wade v. Southwestern Bell Telephone Co., 352 S.W.2d 460, 462 (Tex.Ct.Civ.App.1961); Barbier v. Barry, 345 S.W.2d 557, 563 (Tex.Ct.Civ.App.1961).

In support of the award made by the district court, McBrayer points to the following: extensive national publicity received by Water Wagon; 6,000 inquiries from the United States and several foreign countries concerning the water wagon; the marketing of the water wagon for approximately five years prior to the date of the contract, September 21, 1971; the sale of 382 water wagons between December 8, 1970, and the date of the contract; the sale of 669 units between the contract date and March 27, 1972, the date of Teckla's sale of Water Wagon to Canyon Plastics; the shipment of 350 units to dealers in this country and other countries during the first month of Teckla's operation of Water Wagon; a financial statement of September 21, 1971, prepared by Water Wagon's accountant, which showed a profit of $2,114.38 for the company's first nine and one-half months of operation, December 8, 1970 to September 20, 1971; and testimony that the limitation of incentive payments to the sale of 60,000 units over the six-year period was placed in the contract because Teckla thought that more than 60,000 units would be sold during the term of the contract.

Teckla argues that the business of selling water wagons was new, unestablished, and unprofitable, and that, therefore, the jury's estimation was founded on speculation and conjecture. Teckla has suggested several factors in support of its contention. At the trial, Teckla presented a financial statement it had prepared which showed, in contrast to Water Wagon's own statement, that Water Wagon had suffered a loss of $5,110.07 for the period from December 7, 1970 to July 31, 1971. The primary difference between the two statements was the capitalization of certain expenses in Water Wagon's statement. Water Wagon's accountant testified that he thought Teckla's version was "a little more accurate." Teckla also contends that it had a loss of about $7,000 on the Water Wagon operation in December 1971, and that, when Teckla sold the Water Wagon operation to Canyon Plastics on March 27, 1972, an audit reflected a $56,000 loss on its investment, including an operational loss of about $38,000. Concerning the 60,000 unit limitation on incentive payments, Teckla argues that there is no evidence that the figure was more than simply a dream of the parties.

█ We are persuaded that, with the facts and circumstances presented here, the jury lacked a valid basis on which to conclude that 46,000 units would have been sold during the six-year term of the contract. *See* Center Chemical Company v. Avril, Inc., 5 Cir., 1968, 392 F.2d 289, 291. The evidence shows that the contract was executed in the

hope of developing Water Wagon into a successful concern. *See* Archer-Daniels-Midland Company v. Paull, 8 Cir., 1961, 293 F.2d 389. The agreement between Teckla and McBrayer was made to finance a new, unestablished business, and not an established commercial enterprise, *see* First Nat. Bank v. Donohoe, 293 S.W. 217, 219 (Tex.Ct.Civ.App. 1927); and it has not been adequately shown that the water wagon business was a going concern at any point during the period under consideration.[2] It was too speculative an exercise for this jury to attempt, on the basis of the meager sales and earnings figures for the early months of Water Wagon, to estimate the projected sales of the company during a six-year period. In this connection, we note also that it was not shown either that Teckla's successor, Canyon Plastics, was obligated to sell water wagons or that Canyon Plastics in fact undertook to continue the Water Wagon operation. *See* Manney v. Burgess, 346 S.W.2d 937 (Tex.Ct.Civ.App.1961). In sum, the evidence presented by McBrayer does not provide a reasonably certain foundation for either the jury's conclusion that 1,000 units would have been sold during the first six months of the contract or its finding that 45,000 units would have been sold over the next five and one-half years, if Water Wagon had been financed as agreed. We conclude as a matter of law, therefore, that McBrayer was not entitled to recover lost incentive payments for the term of the contract.

**B. Employment Obligation**

 Teckla's final contention is that McBrayer is not entitled to recovery under the employment agreement because there was no assessment by the jury of the amount of damages suffered by him as a result of Teckla's breach. Teckla argues that in assessing damages the jury should have considered possible

mitigation of damages by McBrayer. The law of Texas is clear, however, that the burden of proving that damages could have been mitigated is on Teckla, the breaching party. *E. g.*, Hardison v. Beard, 430 S.W.2d 53 (Tex.Ct.Civ.App. 1968); 17 Tex.Jur.2d § 36 (1960, Supp. 1973). Teckla has failed to carry this burden. We reject Teckla's final contention.

---

The judgment of the district court is affirmed insofar as the award to Mc-Brayer of $10,667 for Teckla's breach of the employment obligation and is reversed insofar as the award to Mc-Brayer of $46,000 for Teckla's breach of the agreement to finance.

Affirmed in part, reversed in part.

---

2. *See* Atomic Fuel Extraction Corporation v. Slick, 386 S.W.2d 180, 189 (Tex.Ct.Civ.App. 1964):

"An established business should be one that is in actual operation long enough to give it permanency and recognition. It should be one that has earned a profit which can reasonably be ascertained and approximated. . . . Proof of an operation of a business at a loss fails to meet the test."