**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 00-20586

BRECK CONSTRUCTION COMPANY, INC.

Plaintiff-Counter Defendant-Appellant,

VERSUS

AIR LIQUIDE AMERICA CORPORATION;
AIR LIQUIDE PROCESS & CONSTRUCTION, INC.

Defendants-Counter Claimants-Appellees.

Appeal from the United States District Court
For the Southern District of Texas
(H-98-CV-2533)
November 21, 2001

Before SMITH, DUHÉ and WIENER, Circuit Judges.

Per Curiam:[1]

Plaintiff and counter-defendant, Breck Construction Co., Inc. appeals a summary judgment holding it liable for damages under a construction contract. Contracting with Breck were Air Liquide America Corporation ("ALAC"), owner of a plant in Longview, Texas, and Air Liquide Process & Construction, Inc. ("ALPC"), the engineer, both of whom are defendants and counter-claimants (collectively called "AL").

Breck sued AL on sworn account for overdue invoices, for

---

[1] Pursuant to 5ᵀᴴ CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

breach of contract, and for fraud.  AL countersued for breach of contract and breach of warranty pertaining to a tower erected by Breck which leaned some inches from vertical and rust damage discovered in the gear box of a compressor installed by Breck.  On cross motions for summary judgment, the district court found for AL, denying Breck's claims and awarding AL damages, minus amounts withheld on Breck's invoices.  Breck appeals.  Also at issue are the denial of Breck's claim for statutory attorney's fees and multiple claims of abuse of discretion in pre-trial matters. For the following reasons, we reverse and remand.

## DISCUSSION

**A. Rust Damage**.  Breck challenges the district court's summary judgment finding it liable for rust damage to the gear box of the compressor.  We have independently reviewed the summary judgment evidence and find the undisputed evidence as follows:  AL ordered the compressor new from Cooper Industries, who delivered it in parts directly to Breck, who then assembled and installed it at the Longview plant.  At some point after installation, rust damage, gasket residue, and standing water were found in its gear box.  The contract charged Breck with the responsibility to

> exercise due care and attention in the handling of all equipment and material supplied to him, to eliminate or minimize the possibility of damage before, during and after installation, and [to] provide suitable and adequate forms of protection and storage to maintain said equipment and material in a clean, functional and sound state. 3 R. 870.

The question whether a party fails to exercise due care in

2

performing its duties is ordinarily a question for a factfinder. See Harle v. Krchnak, 422 S.W.2d 810, 815 (Tx. App.-Houston [1st Dist.] 1967. writ ref'd n.r.e.)(discussing "reasonable care" in negligence context); McBrayer v. Teckla Inc., 496 F.2d 122 (5th Cir. 1974)(discussing "in a reasonable and businesslike manner" in Texas contract).

As in Harle, this record contains evidence that Breck exercised "some degree of care." Some evidence suggests that Breck sought to follow the manufacturer's installation guidelines by refusing to break the manufacturer's seals or open the gear box cover unless in the presence of a manufacturer's representative. AL had agreed to provide all technical representatives at no cost to Breck when required during equipment installation, and Breck requested AL to schedule a visit from a Cooper authorized representative. When AL refused due to budgetary constraints and instructed Breck to proceed with assembly without the inspection and supervision of a factory representative, Breck promptly began assembly and mounting of the compressor in July 1997, without opening the gear box. 11 R. 3796-95; 16 R. 5583; 3 R. 802, 700, 702, 699, 685-82.

There is evidence, too, that if a vendor's representative had been present at the assembly of the compressor, he would customarily have opened and inspected the internals of the gear box, and that he alone was authorized to remove inspection plates

to check the gear box.[2]  Evidence suggests that ALAC waived the presence of factory representative at the compressor assembly, and that ALPC assured Breck it would not be responsible for rust.  11 R. 3795, 3800; 3 R. 687-82; 20 R. 6945, 6946.

Additional evidence established that AL requested Breck to nitrogen purge the compressor, to prevent oxidation and rust.  Other evidence suggests that water was already present when the compressor was assembled, and that no one knows when the rust formed.  According to Breck's expert Papacostas, a nitrogen purge would not drive out settled puddles of water or remove accumulated rust.  Finally on the issue of nitrogen purge, the installation manual prohibits alteration of the equipment without the presence of a Cooper representative; also, the contract would prohibit

nitrogen purge without *written* permission of ALPC.[3]  11 R. 3795; 3 R. 700.

From the foregoing evidence, a fact finder might conclude that Breck met its contractual duty by exercising all the care that was

---

[2]  A factory representative did come in October 1997 for "final assembly, line-up, and start-up" of the compressor.  At that time ALPC directed Breck to disassemble the compressor to open ports for inspection, and extensive corrosion was then discovered.  3 R. 699.

[3]  The contract provides, "In handling and installing . . . newly supplied equipment, the Contractor . . . shall not modify, rework or in any other way change the said equipment, except with the prior written permission of the Engineer."  3 R. 869.

4

"due" under the circumstances to protect the gear box and compressor upon their arrival. Summary judgment is inappropriate when the evidence is susceptible of different conclusions or different inferences by the trier of fact. <u>Chen v. City of Houston</u>, 206 F.3d 502, 506 (5th Cir. 2000), <u>cert. denied</u>, 121 S.Ct. 2020 (2001). <u>Swanson v. General Servs. Admin</u>., 110 F.3d 1180, 1191 (5th Cir.) <u>cert. denied</u>, 522 U.S. 948 (1997). Summary judgment is inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts. <u>Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.</u>,669 F.2d 1026, 1031 (5th Cir. 1982). Accordingly, summary judgment on this issue is reversed and the matter remanded for trial.

**B. The Argon Tower**. Breck also appeals the summary judgment holding it liable for AL's expenses to re-establish verticality of the argon tower. The district court based its judgment on finding that the tower declined from vertical by 3.5″ within a year, and holding that Breck warranted that the tower would not decline by more than 1" in a year. We first address the scope of Breck's warranty.

Breck guaranteed 1) that "all work . . . shall conform to specifications and to all other provisions of this Contract," and 2) that all work would "be free from defects for a period of twelve (12) months after completion." Contract § 4.1.1, 3 R. 875. The

5

contract also contains instructions and specifications for the tower's erection procedure. 3 R. 922, 751-748.

The tower consists of a process vessel on the interior (for cryogenic fabrication of argon gas)(installed by a third party, Naptech), and an insulating exterior "cold box" structure to support and protect the process equipment, erected by Breck. 16 R. 5562; 3 R. 753-52.

Under the contract, a fabricator was to ship two 100' sections of the 200'-tall cold box along with a structural steel stair tower approximately 100' tall, also to be shipped in two pieces. Breck was responsible for welding "column sections" together, and for unloading, placing, "leveling," and grouting the stair tower. Prefabricated structural steel parts (supports, platforms, ladders, etc.) were to be delivered, with Breck to bear the responsibility to "erect, fit-up, [and] level" those loose items. Step Two of the erection procedures required Breck to have the lower section "levelled and plumbed using shop markers." Breck was then to "verify verticality of the process vessel." Step 9 required the "upper section of Box #3 to be erected in vertical position" and step 15 required Breck to "verify verticality of process vessels and adjust if needed by using remaining adjustable supports" at various elevations. A "final verification of vessels verticality" was required in step 21.

These detailed specifications and erection procedures do not define "verticality," "leveling," or "plumbed." 3 R. 751-48. For

6

a verticality tolerance, Breck points to contract clause § 5.2 (not in the erection procedures), providing for compliance with the code of the American Institute of Steel Construction (AISC), which would allow this 200' tower a 4.8" declination tolerance.  See 3 R. 869; 4 R. 1313; 20 R. 7004.

The district court found no genuine issue of material fact as to the tolerance for verticality for the cold box using, not AISC standards, but "reasonable construction standards," and finding that tolerance to be 1-inch from absolute verticality for the tower.  16 R. 5487.

Although contract interpretation is usually question of law for the court, if the interpretation depends on resolution of factual disputes, a trier of facts must resolve such disputes. Cook Indus. Inc. v. Community Grain, Inc. 614 F.2d 978, 980 (5th Cir. 1980) (recognizing whether and how to read rules of trade into a contract as fact questions). If the meaning of a contract is uncertain or if the contract is reasonably susceptible to more than one meaning, then it is ambiguous and its meaning must be resolved by a finder of fact.  718 Associates, Ltd. v. Sunwest N.O.P., Inc., 1 S.W.3d 355, 360 (Tx. App.-Waco 1999).  Where extrinsic evidence is used to interpret an ambiguous contract, the interpretation is a question of fact, not law.  Thornton v. Bean Contracting Co. Inc., 592 F.2d 1287, 1290 (5th Cir.), modified, 597 F.2d 62 (1979).

Reviewing the summary judgment evidence de novo, we find the

7

contract ambiguous as to the verticality tolerance, and that determining the contractual intent depends on resolution of factual disputes. Supporting AL's position and the district court's finding is the fact that Breck's project superintendent Marvin Hopper declared, "I would not have satisfied myself with an inch deviation or more." 11 R. 3752;[4] speaking about the appropriate verticality tolerance, Breck's president testified that he "defer[s] to the project supervisor of getting with owners and our clients and determining what they're looking for." 8 R. 2607. But Hopper testified, too, supporting Breck's position, that he believes that the AISC Code applies to erection of the cold box (the 1:500 standard, translating to a 4.8" declination tolerance for the tower at issue). 11 R. 3752. Since the district court found that the tower declined from vertical *by less* (approximately 3.5"), Hopper's own testimony raises material fact issues as to the contractual standard and provides grounds for reversing the summary judgment. <u>See</u> <u>Airmark, Inc. v. Advanced Systems, Inc.</u>, 715 F.2d 229, 230 (5th Cir. 1983) (recognizing fact issue regarding scope of contractually agreed duty precluding summary judgment).

Additional questions surround the issue of whether and how to read the AISC code into the contract. The AISC standard of applies to "supplied equipment and materials" and "field assemblies" to be

---

[4] Hopper noted that the 1" standard was "just a goal I set up for myself," explaining, "your goal is always for perfect. . . . Well in any job you do. Your strive for the – you do the best you can do." 11 R. 3683, 3752-51.

8

erected.  Contract § 5.2 (3 R. 869).  AL challenges the Code's application contending that the tower was not "supplied," but does not explain why the tower is not a "field assembly."  As Patterson testified, the language of Section 7.11.3.2(d) of the AISC Code certainly suggests that it would apply to such a process as the tower erection, as it  discusses prefabricated pieces assembled in the field.[5]  Another dispute about how to apply the AISC code is presented in the contrast between Patterson's reference to section 7.11.3.2(d) entitled "Members Other than Columns," and Hopper's designation of section 7.11.3.1 on "Columns" as applicable.  11 R. 3752, 3731.   Finally, Patterson notes the paradox that AISC standards seem to exclude process vessels altogether, by exempting "pressure vessels" from its definition of "Structural Steel," §2.2. 11 R. 3726, 3731.[6]  The questions of how and whether to read the Code into the contract are factual.  Cook, 614 F.2d at 980.  Both parties have offered arguable interpretations of how the AISC standard applies.  Because of the disputes about the appropriate standard of verticality, the determination of the parties' intent is a question of fact calling for reversal of the summary judgment.

---

[5]  Section 7:11.3.2(d) provides that "Individual shipping pieces which are segments of field assembled units containing field splices between points of support" are considered plumb, level and aligned if the verticality tolerance does not exceed 1: 500.  11 R. 3728.

[6]  Former CEO of ALPC Marchand, a chemical engineer, noted that the contract incorporates both the AISC Code of Standard Practice and the Pressure Vessel Handbook.  4 R. 1355-54.  According to the Pressure Vessel Handbook, deviation from vertical for the shell of a pressure vessel is a maximum of 1 ½" for a vessel over 30', and no one has argued that this is the appropriate declination standard.  4 R. 1308.

<u>Transource Intern., Inc. v. Trinity Industry, Inc.</u>, 725 F.2d 274, 289 (5th Cir. 1984).

**C. Damages.** Because of our reversal pertaining to the gear box and tower, we need not address Breck's claims of error in the award of damages.

**D. Attorney's Fees.** AL withheld payment of invoices submitted by Breck because of the repair expenses for the tower and the rust damage, and the district court allowed an setoff of the withheld amount from its damage award to AL. Breck contends that it "prevailed" on its claim on the invoices so as to entitle it to an attorney fee award, even if its claim is entirely offset by AL's counterclaims.

Under the "Notice to Cure" provision Owner has the right to "withhold payment of any monies due" if Breck defaults, pending corrective action to the satisfaction of Owner. Contract §§ 11.1.2 & 11.1.3, 3 R. 887. In view of our holding with respect to AL's motion for summary judgment, whether Breck defaulted and whether AL was within its rights to withhold payment on the invoices are two unresolved facts bearing on whether Breck "prevailed." Accordingly, it would be premature to address the question of statutory attorneys fees.

Though not framed as a separate assignment of error, Breck has also asked this Court to reverse and render on its own motion for summary judgment pertaining to its account and invoices, noting

10

that the district court recognized that Breck's accrued balances were due.  See 22 R. 7750, when the court declared, "No evidence proffered refutes the accuracy or propriety of the invoices."  This recognition by the district court is apparently inconsistent with the court's statement, when denying Breck's motion, that significant issues exist regarding amounts Defendants owe Breck on the accounts.  5 R. 1525.  Our same reasons for declining to rule on attorneys fees, however, preclude us from rendering summary judgment for Breck on its invoices.  The district court will have ample opportunity to clarify the apparent inconsistency.

**F. Pre-Trial Matters**.  Breck also contends that numerous discovery abuses and other pre-trial rulings had the cumulative effect of denying it due process.  No error or defect in any ruling or order is ground for disturbing a judgment or order, "unless refusal to take such action appears to the court inconsistent with substantial justice."  Fed. R. Civ. P. 61. Moreover, our intervention into the district court's broad discretion in managing pretrial discovery is "warranted 'only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party.'"  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1424 (5th Cir. 1996)(en banc)(quoting Maynard v. CIA, 986 F.2d 547, 567 (1st Cir. 1993)).  Breck cannot show such prejudice in view of our remand.

11

In consideration of the foregoing, we vacate the judgment of the district court based on the summary judgment rulings in favor of AL, excepting that ruling denial of Breck's motions for summary judgment.  Our ruling obviates the need to address the attorneys fees issue and the allegations of discovery abuse and other pre-trial matters.  The judgment of the district court is

VACATED and the matter REMANDED.